The Motel Company v. Commissioner.
Motel Co. v. Commissioner
Docket No. 88320.
United States Tax Court
T.C. Memo 1963-174; 1963 Tax Ct. Memo LEXIS 169; 22 T.C.M. (CCH) 825; T.C.M. (RIA) 63174; June 26, 1963
*169 1. The father of petitioner's president and principal stockholder advanced $100,000 to petitioner at the time of its organization in May 1955, taking petitioner's note secured by a third mortgage on its properties; and the father further advanced $236,000 to petitioner during 1956, which was used for erecting additional rental units, taking a demand note from petitioner when anticipated bank financing failed to materialize. Held, the first advance was a contribution of risk capital, with respect to which no interest expense deductions are allowable; and the second advance created a bona fide indebtedness, with respect to which interest expense deductions are allowable at the rate provided for in the note. 2. Held, in the particular circumstances here present, that an advance by petitioner's president of $20,224.93 in November 1956, created a bona fide indebtedness; and that an interest expense deduction for the year ended April 30, 1958, is allowable at the 6 percent rate provided for in the note issued by petitioner to evidence said advance. 3. Held, petitioner neither bargained for nor paid for good will in the purchase of a motel; and the fair market values of its tangible depreciable *170 properties were no less than the portions of the purchase price allocated to them. Accordingly, petitioner is entitled to the full amounts of the deductions for depreciation claimed by it with respect to said tangible assets. 4. Held, where petitioner's president made some personal use of the automobile owned by petitioner, respondent correctly disallowed a portion of the operating expense and depreciation deducted with respect thereto. Monroe J. Winsten, 320 Broadway, New York, N. Y., for the petitioner. Douglas D. Robertson, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respendent determined deficiencies against petitioner in its income tax for years and in amounts as follows: Taxable year ended
April 30
Deficiency
1956
$ 5,153.86
1957
17,528.27
1958
10,180.85
The issues presented are: 1. Whether certain advances to petitioner by Harry Shwartz, the father of petitioner's principal stockholder, constitute contributions to the capital of petitioner, or bona fide loans to petitioner. [1] *171 2. (a) Whether an advance to petitioner by Leonard Shwartz, its president and principal stockholder, constitutes a contribution to the capital of petitioner, or a bona fide loan to petitioner. (b) Whether, if such advance by Leonard Shwartz constitutes a loan, interest for the taxable year 1958 in the amount of $2,144.05 which was claimed as a deduction by the petitioner, was in excess of that called for by the purported evidence of indebtedness. 3. Whether any part of the $260,000 which petitioner agreed to pay for the acquisition of the tangible assets of Rip Van Winkle Motel, Inc., represented payment for good will. If it was, then it is agreed that respondent correctly disallowed a portion of the depreciation expense with respect to said cost, claimed as a deduction on petitioner's return for each year. 4. Whether petitioner is entitled to deduct in full, the automobile expenses and depreciation claimed by it for the operation of an automobile, used on occasions by its president-principal stockholder for his personal use. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein *172 by reference. Issue I Petitioner is a corporation organized under the laws of the State of Connecticut on May 24, 1955. Its principal business is the operation of a motel at New Haven, Connecticut; and its offices are located at New Haven. Petitioner filed corporate Federal income tax returns on an accrual basis for the fiscal years ended April 30, 1956, April 30, 1957, and April 30, 1958, with the district director of internal revenue at Hartford, Connecticut. Petitioner's authorized and issued capital stock, at all times here material, consisted of 100 shares of $100 par value stock; and said stock was held of record as follows: Leonard Shwartz
98 shares
Renee Shwartz (wife of Leonard)
1 share
Bertha Shwartz (mother of Leo-
nard)
1 share
100 shares
Leonard Shwartz was the sole subscriber to the capital stock of the petitioner; and he paid in the sum of $10,000 in full payment of his stock subscription. To qualify his mother and his wife as directors of the petitioner corporation, Leonard caused to be transferred to each of them 1 share out of his 100 shares. Neither his mother nor his wife paid for the share of stock each received; and there was an agreement between Leonard and them that *173 their qualifying shares would be returned to Leonard at such time as they ceased to be directors of the petitioner. The officers and directors of petitioner at all times material hereto were: Leonard Shwartz (president, treasurer, and director), Bertha Shwartz (vice president and director), and Renee Shwartz (secretary and director). Harry Shwartz (who was the father of Leonard, the husband of Bertha, and the father-in-law of Renee) was employed in a salaried position by the petitioner, the duties of which position are not established by the evidence in this case. Under the terms of a warranty deed bearing the date of May 28, 1955, the petitioner acquired the title to certain property known as the "Rip Van Winkle Motel" (hereinafter referred to as the "motel") from a corporation named Rip Van Winkle Motel, Inc. The stated purchase price was $260,000; and the property acquired included the motel (containing 29 rental units), the underlying land, and the motel's furnishings and equipment. The purchase price was satisfied in the following manner. Petitioner assumed an existing 5 percent first mortgage on the motel property held by a New Haven bank, in the amount of $52,793.10; issued *174 a purchase-money second mortgage to the vendor in the principal amount of $100,000, bearing interest at the rate of 5 percent; and paid the remaining approximately $107,200 in cash. The corporation's sources of funds for the cash payments were the initial capital contribution to petitioner of $10,000 made by Leonard Shwartz, and a "loan" to the petitioner corporation of $100,000 from Leonard's father, Harry Shwartz. The $100,000 "loan" was evidenced by a "promissory note", secured by a third mortgage on the motel properties, dated May 28, 1955, calling for semi-annual principal payments of $2,500 each on June 1 and December 1, together with interest at the rate of 10 percent per year. The installment payments were to continue for 10 years, at which time the remaining balance of principal was to become due and payable. Failure of the maker to pay any installment of principal or interest when due, would, at the option of the holder, cause the entire unpaid principal and interest to become immediately due and payable. Petitioner paid $2,500, the first installment of principal, on the due date, December 1, 1955. That is the only installment of principal that petitioner ever paid on the *175 $100,000 note. Petitioner reflected the "loan" from Harry in a liability account in its ledger captioned "Third Mortgage Payable - Harry Shwartz." To maintain petitioner's competitive position, its board of directors in December 1955, determined that the facilities of the motel should be enlarged by the addition thereto of 33 new rental units on ground adjoining the then existing facilities. Petitioner did not have sufficient funds of its own with which to erect the new units; and exploratory efforts to secure "institutional" financing [2] for the contemplated building program, were without success. In this situation, Harry Shwartz offered to advance to petitioner such sums as were necessary to acquire the additional land, construct the new units thereon, and make other improvements thereto, such as landscaping and putting in driveways - with the understanding that at the completion of the building program, petitioner would use its best efforts to raise money from a lending institution on the security of a mortgage, which would permit petitioner to pay off the advances to Harry Shwartz. Petitioner agreed to give its demand promissory note, bearing interest at 10 percent, for all sums *176 advanced by Harry. Harry reserved the right to require that he be given a first mortgage on the property improved by the new construction. It was expressly agreed between petitioner and Harry that the advances "were made for temporary financing only." Harry never sought, nor did petitioner ever issue to him, any mortgage with respect to the additional construction. In early 1956, land for the new units was acquired; and by the end of August of that year, the construction of the 33 new units was substantially completed. The funds for the acquisition of the land and for the construction work were advanced by Harry from time to time throughout the year; and they totaled $236,000. Petitioner reflected these liabilities in its books of account in an open loans payable account. While the construction work was in progress, the contractor, acting at the request of Harry, approached the president of a New Haven savings bank, whom he knew, about the possibility of the bank making a loan on the security of a mortgage on the new units. Several meetings between the contractor and the bank *177 president were held, the upshot of which was that the president stated that the bank probably would make such a loan after the completion of the construction work. When the construction work was completed, a formal application for a loan was submitted; but the bank's board of directors turned down the application on the ground that they had adready made a mortgage loan to another motel in the vicinity of petitioner, and they did not desire to make any more motel mortgage loans. Harry himself also sought mortgage financing for the new construction during 1956, but without success. Leonard also sought the assistance of petitioner's account and a real estate-mortgage broker in obtaining a mortgage loan for petitioner, but these were likewise unsuccessful. On December 31, 1956, petitioner, having failed to raise funds by means of a mortgage loan, issued its demand note to Harry in the amount of $236,500, [3] *178 with interest at 10 percent per annum. The only payment of principal made with respect to this demand note was a $2,500 payment on October 31, 1957. During the taxable years involved, petitioner recorded in its books the following amounts of "interest" expense, on the two above-described "notes" issued by it to Harry Shwartz: Year ended
Amount of
April 30
interest
1956
$ 9,062.50
1957
32,193.67
1958
33,226.03
Continuing efforts on petitioner's behalf during 1957, 1958 and the first 3 months of 1959, to refinance the existing mortgages and to raise funds for repayment of the $236,000 advances by Harry Shwartz by placing a new first mortgage on the entire motel properties proved unsuccessful. Petitioner's "note" of December 31, 1956, in the face amount of $100,000 was in default continuously from and after June 1, 1956, when the second installment of principal was due to be paid but was not paid. On April 30, 1959, petitioner gave a quit-claim deed to Harry, covering the two parcels of land owned by the petitioner together with the motel buildings thereon, purportedly in lieu of foreclosure by Harry on petitioner's third mortgage. Said deed, which was recorded in the public records of New Haven on June 5, 1959, was given about 7 weeks after an agent of the respondent concluded his examination of petitioner's tax returns for the years *179 here involved. In an instrument of lease dated May 1, 1959, Harry as lessor purported to lease to petitioner the motel properties conveyed to him the day before under the quit-claim deed just mentioned, for a fixed term of 20 years, with a right in the lessee to renew the lease for three periods of 10 years each. The rental provided was $42,000 per year, plus 50 percent of the net income of petitioner in excess of $20,000, plus the payment by petitioner of all taxes and assessments levied against the premises. Following the execution of the "lease," petitioner continued to operate the motel with the same officers and directors and in the same manner, as it had prior thereto. In petitioner's Federal corporate income tax returns for the years here involved, it reported revenues, expenses, and taxable income (or loss), as follows: Taxable year ended April 30
1956
1957
Revenues from rental of
$79,117.00
$169,150.83
units
Other income
661.57
1,353.25
Total income
$79,778.57
$170,504.08
Less: Costs and expenses
Linen costs
$ 2,686.32
$11,316.02
Officers' Compensation
7,200.00
9,705.00
Salaries & wages (other
than officers)
12,962.23
21,579.97
Repairs
3,825.48
5,905.29
Taxes
4,449.07
7,462.22
Contributions
45.00
130.00
Depreciation
15,849.82
41,388.23
Miscellaneous expenses
14,731.62
26,584.59
Interest
15,685.60 [1]
39,821.89 [2]
Total costs and expenses
77,435.14
164,343.21
Taxable income (or net
$ 2,343.43
$ 6,160.87
loss)
*180 Taxable year ended April 30
1958
Revenues from rental of
$181,783.40
units
Other income
2,093.28
Total income
$183,876.68
Less: Costs and expenses
Linen costs
$12,774.68
Officers' Compensation
17,520.00
Salaries & wages (other
than officers)
28,783.25
Repairs
5,995.66
Taxes
11,717.06
Contributions
Depreciation
48,566.43
Miscellaneous expenses
28,654.90
Interest
41,603.88 [3]
Total costs and expenses
195,615.86
Taxable income (or net
($ 11,793.18)
loss)
Also, it reported the following assets and liabilities on balance sheets attached to its Federal income tax returns: Taxable year ended April 30
ASSETS
1956
1957
1958
Cash
$ 44,103.24
$ 7,859.34
$ 1,245.00
Accounts receivable
179.50
702.77
1,031.49
Prepaid expenses and supplies
808.91
1,134.83
4,528.70
Buildings and other depreciable assets
(less provi-
sion for depreciation)
219,449.65
477,516.72
430,822.14
Land
66,097.79
66,097.79
66,097.79
Other assets
24,684.30
838.20
408.12
$355,323.39
$554,149.65
$504,133.24
LIABILITIES
Accounts payable
$ 2,139.04
$ 2,264.87
$ 9,027.37
Bonds, notes, and mortgages - due
within 1 year or
less
24,092.89
21,628.30
Accrued expenses
6,399.99
30,714.87
21,826.06
Bonds, notes and mortgages - due in
more than 1
year
326,449.22
457,096.92
423,210.72
Other liabilities
8,694.74
24,027.09
26,249.45
Capital stock
10,000.00
10,000.00
10,000.00
Retained earnings
1,640.40
5,953.01
(7,808.66)
$355,323.39
$554,149.65
$504,133.24
*181 The petitioner corporation has never paid a dividend on its capital stock. In his statutory notice of deficiency, the Commissioner determind that the purported loans by Harry Shwartz to petitioner were a "part of risk capital." Further, he determined that interest expense with respect to such loans, in the above-mentioned amounts of $9,062.50, $32,193.67, and $33,226.03 (which were included in the interest expense claimed as a deduction in petitioner's returns for each of the taxable years 1956, 1957, and 1958, respectively), constituted returns of such risk capital; and accordingly, that they were not deductible by petitioner. Issue II During the fall of 1956, petitioner required approximately $20,000 additional funds for its working capital needs. In October or early November of that year, petitioner's president, Leonard Shwartz, applied on behalf of the petitioner to a New Haven bank for an unsecured loan to petitioner in an amount slightly in excess of $20,000; but the bank officers stated that the bank could not see its way clear to making such a loan at that time. Thereupon, Leonard himself advanced to the petitioner $20,224.93 from his own funds for its working capital needs. *182 On November 15, 1956, at special meeting of petitioner's board of directors, the directors were informed of Leonard's advance and the circumstances surrounding the same, and a resolution was adopted authorizing the petitioner to issue to Leonard its promissory note, due in 120 days, for the amount of the advance. The directors present at the meeting agreed that said note should be substantially liquidated on its due date, and if not liquidated in full at that time, a short-term extension should be requested. On the same date, November 15, 1956, petitioner issued to Leonard its promissory note, due and payable in 120 days, in the principal amount of $20,224.93, with interest at 6 percent. When the note became due, petitioner did not have funds with which to pay the principal amount of said note; and Leonard, petitioner's president as well as the payee of the note, did not make any demand for payment thereof. No principal payments have ever been made with respect to said note. Petitioner did make a payment of "interest" to Leonard, in the amount of $2,144.05, at some time during its fiscal year ended April 30, 1958. Petitioner treated said payment as interest on its books of account, *183 and it included the amount thereof in the interest expense claimed as a deduction on its Federal income tax return for the year ended April 30, 1958. Leonard reported the amount so paid to him as interest income on his individual Federal income tax return for 1958. Leonard at no time subordinated his rights under the note of petitioner which he held, to the claims of any other creditors of the petitioner. Respondent, in his notice of deficiency, determined that the deduction claimed for interest in the amount of $2,144.05 for the taxable year ended April 30, 1958, was not allowable on the ground that Leonard's advance was a contribution of risk capital. Respondent further determined, in the alternative, that "in the event that such advances of any part thereof are determined to be loans, * * * a reasonable rate of interest * * * would be 5% in lieu of the 10% rate claimed by you." Issue III Of the total purchase price of $260,000 agreed to by petitioner for the purchase of the motel buildings, the underlying land, and the motel's furnishings and equipment, the petitioner allocated $224,402.21 thereof to depreciable assets, as follows: Buildings - old units
$178,856.80
Furniture - old units
21,080.07
Furnishings - old units
17,916.16
Roading - old units
6,549.18
$224,402.21
*184 During the taxable years here involved, petitioner computed its depreciation expense on the basis of the above-stated allocated values, claiming depreciation expense totaling $14,683.15 for said assets in each of the taxable years 1956, 1957, and 1958. [4]
The Commissioner, in his statutory notice of deficiency, determined that of the $260,000 total purchase price, the amount of $90,222.97 was good will, and therefore not subject to depreciation. Accordingly, he disallowed $5,648.59 of the depreciation claimed by petitioner for each of the taxable years ended April 30, 1956, April 30, 1957, and April 30, 1958. Ultimate Finding of Fact The real property and tangible personal property acquired *185 by petitioner had fair market values of not less than those amounts allocated thereto by the petitioner. Good will was not a factor in the transaction by which petitioner purchased the motel, and was neither bargained for nor paid for by petitioner in purchasing the motel. Issue IV During the early part of the taxable year 1956, petitioner owned an Oldsmobile automobile; and for the remainder of 1956 and during all of the taxable years 1957 and 1958, it owned a Plymouth automobile. In its corporate Federal income tax returns for said years, it claimed deductions for automobile expenses and depreciation as follows: Taxable year
ended
Deprecia-
April 30
Expenses
tion
1956
$ 508.05
1957
687.14
$ 440.00
1958
2,031.11
1,364.17 During each of the 3 taxable years here involved, the aforesaid automobiles were used by Leonard, who was the president and principal stockholder of petitioner, for going to and from his home and the motel. However, said automobiles were also used by Leonard for the solicitation of customers for the motel, for purchasing supplies for the operation of the motel, and for other trips on motel business. The Commissioner, in his statutory notice of deficiency, determined that a portion *186 of the expense of operating the automobiles and that a portion of the depreciation thereon should be disallowed as being the personal, nonbusiness expenses of Leonard. Accordingly, he disallowed the following automobile expenses and depreciation, which represent a portion of the totals of such expenses claimed by petitioner as a deduction in its corporate Federal income tax returns for the years here involved: Taxable year
ended
Depreci-
April 30
Expenses
ation
1956
$125
1957
172
$110
1958
508
368
Opinion I. The first issue presents the question of whether the petitioner is entitled to interest expense deductions for the amounts which it accrued and paid to Harry Shwartz, the father of petitioner's president and (for all practical purposes) its sole stockholder, during each of the taxable years involved. Said amounts were paid with respect to two notes, both described in our Findings of Fact: One for $100,000 dated May 28, 1955; and the other for $236,500 (the correct amount of which, it has been conceded, was $236,000). The 10 percent rate of interest provided for in each of the notes, though initially and alternatively challenged by the respondent as being excessive, is now conceded by the respondent *187 to be a reasonable rate of interest, if it is determined that the notes did represent a debt. He contends that the moneys advanced to petitioner by Harry Shwartz were contributions to the risk capital of the petitioner, rather than loans; and that consequently, payments made by petitioner to Harry, as purported interest, represented repayments of such risk capital to Harry rather than "interest on indebtedness," deduction of which is authorized by section 163(a) of the 1954 Code. At the very outset, it must be noted that the case presents a somewhat unusual aspect - i.e., the respondent is seeking to characterize as risk capital, sums of money advanced to a corporation by an individual who is not a stockholder of record of said corporation. The situation is unusual, but it is not unprecedented. In Zephyr Mills, Inc. v. Commissioner, 279 F. 2d 494, affirming a Memorandum Opinion of this Court, advances made to a corporation by certain trusts which were not shareholders were held to be capital contributions rather than loans as they were claimed to be, in view of the trustee's position [5] as an officer and director of the corporation, of which the sole stockholder was the said trustee's *188 wife. While in the instant case, Harry Shwartz was neither an officer nor director of the petitioner, he was the father of Leonard Shwartz, the president-treasurer and a director; the husband of Bertha Shwartz, vice president and a director; and the father-in-law of Renee Shwartz, secretary and a director and the wife of Leonard. The record is somewhat sketchy regarding Harry's participation in the affairs of the corporation, but we do know from the minutes of the December 31, 1955, directors' meeting that he reserved for himself the right to seek funds on behalf of the corporation from institutional investors; that he was in fact active in seeking a loan for petitioner; that it was at his request that extensive efforts were made to obtain a mortgage loan from the New Haven bank; and that he held a salaried position with the petitioner. Considering the relatively large amounts of money which he was advancing to the petitioner and the close family group that he and the officers and directors constituted, we think it entirely reasonable to infer, as we do, that he took at least a moderately active part in the management of petitioner's operations. Perhaps he was not so deeply involved *189 in petitioner's affairs as was the trustee in the corporation-taxpayer in the Zephyr Mills case, supra; nevertheless, we think that case furnishes legal warrant for holding Harry's advances to be contributions of risk capital, assuming the surrounding factual circumstances (presently to be discussed) justify their characterization as such - notwithstanding Harry's not being a stockholder of record. It is well to note also that the Internal Revenue Code itself recognizes that nonshareholders may make capital contributions to corporations. In section 362(c) it is provided that if property other than money is contributed to the capital of a corporation, and if it "is not contributed by a shareholder as such, then the basis of such property is zero." We recently applied this section in Veterans Foundation, 38 T.C. 66, affd. (C.A. 10) F. 2d , wherein we held that articles of clothing and appliances contributed to the taxpayer by members of the general public, were contributions to the taxpayer's capital. See also Brown Shoe Co. v. Commissioner, 339 U.S. 583. We turn to a consideration of whether, under the particular facts and circumstances *190 of this case, Harry's advances were loans or whether they were contributions of risk capital. Formwise and in terms of treatment on the books and records and income tax returns of the petitioner, the advances had distinctly the characteristics of loans. But, of course, it is well established that these two criteria, while they must be given consideration, are not controlling. See Emanuel N. (Manny) Kolkey, 27 T.C. 37, 57-58, affd. (C.A. 7) 254 F. 2d 51, and the cases there cited. We are entitled to look beyond the forms and terms employed by the parties, especially where the transactions are between members of a closely related family group. The solution to the problem of determining whether advances constituted loans or contributions of capital depends upon a consideration of all the relevant facts and circumstances. Hoguet Real Estate Corporation, 30 T.C. 580, 598. Considering the $100,000 advance made by Harry to the petitioner on May 28, 1955, only 4 days after the petitioner was organized, we are impelled to the conclusion that this was a contribution to capital. Considering such an advance as a loan, petitioner would have had a very thin capital structure of $252,793.10 of *191 debt and only $10,000 of equity capital or a debt-to-equity ratio in excess of 25-to-1. The $100,000 also represented more than one-third of the amount required to purchase the Rip Van Winkle motel, which was petitioner's principal, if not only, asset - certainly its only income-generating asset. One of the tests applied in determining whether advances are to be classified as loans or as capital contributions, is the ability of the corporation to obtain a loan of the type in question, from outside sources. See O. H. Kruse Grain & Milling v. Commissioner, (C.A. 9) 279 F. 2d 123. Although the record reveals petitioner's lack of ability to obtain loans from institutional investors at times subsequent to its formation, it is not clear as to whether an attempt was made to borrow from outsiders the $100,000 which Harry advanced. Considering the $152,793.10 of outsiders' debt (represented by the first mortgage assumed by the petitioner in the amount of $52,793.10, and a purchase money second mortgage of $100,000 issued by petitioner to the vendor) and the modest equity capital investment of only $10,000, we do not believe that an outsider dealing with petitioner at arm's length would have *192 made a loan of $100,000 to petitioner at the time Harry advanced that sum. Moreover, it is to be noted that only one installment of "principal" was paid on the so-called "note," and that the note was in default from and after June 1, 1956. Yet Harry, the putative creditor, took no steps to foreclose on the "mortgage" securing his "note" for almost 3 years. On April 30, 1959, he did take a quit-claim deed from petitioner (subject to the first and second mortgages), purportedly in lieu of foreclosing on his defaulted "third mortgage." But this act takes on the characteristics of window dressing when it is noted that it took place somewhat over a month after the revenue agent completed his audit of petitioner's returns for the years involved and raised the question of the bona fides of the debt; and that Harry turned around the next day and "leased" the motel to the petitioner - realistically, nothing more than a restoration of the status quo ante. In the light of all the circumstances surrounding the advance of the $100,000, we hold the $100,000 represented a contribution of risk capital rather than a loan giving rise to an indebtedness. The advances totaling $236,000 made by Harry *193 during 1956 call, in our opinion, for a different result. The record indicates that there was a reasonable expectation that the New Haven bank would make a loan for the amount required to erect the 33 additional units, after they were completed; and that both petitioner and Harry intended the advances, which were used to pay for this construction, to be temporary financing only, to be repaid when the anticipated bank loan was consummated. For policy reasons which did not appear until after the construction had been completed and the advances made, the bank ultimately refused to make the loan, and Harry was compelled to take petitioner's note. Since we have held that the $100,000 advanced in 1955 represented equity capital, the result is that petitioner's total equity capital was $110,000. Its other long-term debt at this point was only $90,000, making a total of long-term debt of $326,000, and a debt-to-equity ratio of slightly less than 3-to-1. We think that the evident intent of the parties - petitioner and Harry - to create a debtor-creditor relationship as to said $236,000 should be respected and given effect, in the circumstances of this case. We hold that, to the extent of $236,000, *194 petitioner's demand note to Harry of $236,500 represented a bona fide indebtedness. The result of the foregoing is that petitioner is not entitled to any deduction for interest expense with respect to the $100,000 note; but that it is entitled to interest expense deductions, at the rate of 10 percent per annum, for the 4-month period ended April 30, 1957, and for the entire 12-month period ended April 30, 1958, on $236,000. Issue II The second issue presents a question similar to that posed under the first issue. Here the question is as to the deductibility by petitioner of the "interest" called for in the note issued to its president and (for all practical purposes) its sole stockholder. The advance, with respect to which the controverted note was issued, was made by one whose stockholder status is clear and admitted; and so we do not have the problem here, as we did in the first issue, of determining whether an individual, not a stockholder of record, can make advances of capital to a corporation. It is not to be disputed that a stockholder may also be a creditor of his corporation; and this is true, even though he be the sole stockholder. Courts must, and they should, give careful *195 and searching scrutiny to all the facts and circumstances surrounding the purported loan transaction, for there is an undoubted temptation to cast a capital investment as a loan, and thus permit a tax deduction in the form of interest on that "loan" for what is in reality a dividend on invested capital, which is not deductible from gross income in computing the corporation's income subject to the tax collector's bite. Where, however, there is an evident intent of the stockholder to be a lender, and the corporation to be a borrower, and the other facts and circumstances are not such as to negative the existence of such an intent by the parties, we think, as we said above in the first issue (discussing Harry's $236,000 advance), that that intent should be respected and given effect. Considering inter alia that the funds here involved ($20,224.93) were required for working capital (a short-term need); the short term (120 days) of the promissory note, a pure debt instrument; the expressed intent of the directors that the amount should be repaid with promptness and that if it were not so repaid in full at the due date that a short-term extension be sought; and that at the time Leonard advanced *196 the funds, the corporation had $110,000 of invested capital ($10,000 advanced by Leonard at the formation of petitioner, plus $100,000 advanced by Harry in May 1955 and determined by us to have been a contribution to capital) - we think it must be said that the petitioner and Leonard intended that Leonard's advance be a loan to the petitioner corporation. It can not be denied that a bank had refused to make an unsecured loan of roughly the same amount, and we have considered that fact. But it does seem to us that stockholders need not be as hard-nosed as bankers, that is, that in some circumstances they may make a bona fide loan where a banker would not. Without defining the outer limits of such circumstances, we think the circumstances of the present case fall within them. It must be remembered that, at the time petitioner sought the $20,000 unsecured loan, its balance sheet showed Harry's $100,000 as a secured debt of the corporation, rather than capital. It is conceivable that this may have caused the banker to shy away from an unsecured loan. Nor can the failure of the petitioner to repay the principal be accorded sufficient significance to rebut the existence of the debtor-creditor *197 relationship between petitioner and Leonard. Petitioner did not have the money to pay when the time for payment came; but a debtor unable to pay certainly does not justify saying that no debt ever existed. If it were otherwise, there could never be a deduction for a worthless debt - yet the Internal Revenue Code of 1954 grants such a deduction in section 166. We hold that a bona fide debt existed between petitioner and Leonard, from and after November 15, 1956, in the amount of $20,224.93. There is some confusion in the record as to the proper rate and year for the deduction involved in this issue. The note given to evidence the advance provides for interest at the rate of 6 percent. The deficiency notice indicates that a 10 percent rate had been used by petitioner. The petition states that a 10 percent rate was justifiable. We hold that the 6 percent rate is the correct and a reasonable rate of interest. Petitioner, being an accrual basis taxpayer, would be entitled to a deduction for interest with respect to this note for the 5 1/2-month period from November 15, 1956, to April 30, 1957. But it has not claimed any deduction for that period in its return; nor has it assigned as error *198 in its petition a failure to allow it such a deduction. Its sole assignment of error, as respects this loan, is a failure to allow it a deduction for the year ended April 30, 1958. That year is the only one before us under this issue; and we hold that petitioner is entitled to a deduction of $1,213.50 (being 6 percent of $20,224.93 for 1 year) for its taxable year ended April 30, 1958. Issue III The respondent determined that $90,222.97 of the $260,000 purchase price which petitioner paid for the assets of the Rip Van Winkle Motel, was allocable to good will, an asset not subject to depreciation. Petitioner, on the other hand, allocated $224,789.47 of the $260,000 to depreciable assets, and the balance to land, with no part of the purchase price being allocated to good will. Consequent upon his above determination, the respondent reduced the depreciation expense deduction claimed on petitioner's return for each of the years involved. Just where the respondent got the figure for good will is not apparent from this record. However that may be, our finding of ultimate fact on this issue, made after a consideration of all the relevant evidence on the point, disposes of the issue in favor *199 of the petitioner. Good will was not a factor in the purchase transaction, and was neither bargained for nor paid for by the petitioner. Moreover, the fair market values of the tangible depreciable assets of the motel at the time petitioner acquired them, were not less than the portions of the total cost allocated to them by petitioner. Petitioner is entitled to the full amount of its deductions for depreciation with respect to these assets. We so hold. Issue IV The final issue in this case relates to the respondent's partial disallowance of the depreciation and operating expenses of an automobile owned by the petitioner. The respondent explained his action in disallowing about one-fourth of each class of the automobile expense, by stating that the disallowed portion represented the personal nonbusiness use of the automobile by petitioner's president Leonard Shwartz. Leonard did use the car to drive back and forth between his home and the motel each day. He testified that during the course of these trips he would stop to call on business establishments with a view to having them send guests to the motel. There yet remains, even in that circumstance, a nonbusiness use - the portion *200 of the trip between his home and the first stop on the way in, and between the last stop and his home on the way out. Moreover, it is difficult for us to believe that these stops were daily affairs. In these circumstances, Leonard's statement that he "seldom" used the car for personal, nonbusiness use is, simply, not accurate. And we believe that the respondent's partial disallowance of the automobile depreciation and operating expenses was justified. We decide this issue for the respondent. Decision will be entered under Rule 50. Footnotes
1. The respondent conceded on brief "that if all or any part of the advances made to petitioner by Harry Shwartz are determined to be valid loans then an interest rate of 10% is reasonable."
2. Apparently meaning financing from an insurance company, a savings bank, or a building and loan association.↩
3. Although the note is in the face amount of $236,500, counsel for the petitioner conceded at the trial herein, that only $236,000 was advanced by Harry.
1. Includes $9,062.50 paid as "interest" to Harry Shwartz. ↩
2. Includes $32,193.67 paid as "interest" to Harry Shwartz. ↩
3. Includes $33,226.03 and $2,144.05 paid to Harry Shwartz and Leonard Shwartz, respectively.↩
4. The parties herein have stipulated that: If it is determined that goodwill was an element of the original purchase price of the Motel property, then to such an extent, the basis of the tangible property acquired shall be adjusted to reflect the exclusion of the value of goodwill in computing depreciation. If it is determined that goodwill was not an element of said purchase price, then the depreciation as claimed on the petitioner's income tax returns for the years here in issue shall be allowed.↩
5. The same individual served as trustee of each trust.↩