LITTON BUSINESS SYSTEMS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1085–68.    Filed December 26, 1973.

*Deane E. McCormick, Jr.*, for the petitioner.
*Sheldon M. Sisson*, for the respondent.

DAWSON, *Judge:** In his statutory notice of deficiency respondent determined the following deficiencies in the Federal income taxes of Eureka-Carlisle Co. (formerly Eureka Specialty Printing Co.), which was later acquired by petitioner pursuant to a statutory merger:

| TYE July 31— | Amount |
| --- | --- |
| 1962 | $429, 625. 36 |
| 1963 | 307, 903. 49 |
| 1964 | 273, 412. 54 |

Certain concessions have been made by the parties. The only issue remaining for our decision is whether part of a transfer by a parent corporation of its stock to a wholly owned subsidiary, for the purpose of having the subsidiary participate in a reorganization under section 368(a)(1)(C) [1] with a third-party corporation with the use of such stock, was in fact a sale of the stock to the subsidiary creating a bona fide indebtedness from the subsidiary to the parent, so that the subsidiary is entitled to interest expense deductions on amounts paid as interest on such purported obligation.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Litton Business Systems, Inc., the petitioner herein, is the successor to Eureka-Carlisle Co. pursuant to a statutory merger under the laws of the State of New York on August 3, 1969. Eureka-Carlisle Co., to whom respondent issued the statutory notice of deficiency and who initially filed the petition herein, operated under the name of Eureka Specialty Printing Co. (a Delaware corporation) prior to May 31, 1965, and during the years at issue.

Eureka Specialty Printing Co. (a Delaware corporation) (herein referred to as New Eureka) was incorporated on November 20, 1961, under the laws of the State of Delaware, and at that time its principal office was in Scranton, Pa. New Eureka reported its income on the accrual basis and filed its Federal corporate income tax returns on a fiscal year ending July 31. Its return for the period December 1, 1961, to July 31, 1962, was timely filed with the district director of internal revenue at Scranton, Pa., and its returns for the taxable years ended July 31, 1963, and July 31, 1964, were filed with district director of

*Pursuant to a notice of reassignment sent to counsel for the parties and to which no objections were filed, this case was reassigned from Judge Austin Hoyt to Judge Howard A. Dawson, Jr., for disposition.

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

internal revenue at Philadelphia, Pa. During the years at issue New Eureka did not file consolidated returns with a parent corporation.

At the time the petition was filed herein under the name of Eureka-Carlisle Co., the principal office of such corporation was located at San Francisco, Calif.

In 1961, Litton Industries, Inc. (herein referred to as Litton), was interested in acquiring Eureka Speciality Printing Co. (a Pennsylvania corporation) (herein referred to as Old Eureka). Old Eureka was a highly profitable specialty printing company with its principal office located at Scranton, Pa. It had been formed in the late 1890's or early 1900's and had developed an excellent reputation and expertise in high-speed printing, perforating, and coating equipment.

Old Eureka was the largest producer of trading stamps in the United States, printing stamps for most of the approximately 60 companies using trading stamps, such as Sperry & Hutchinson (S & H), Blue Chip, and McDonald. Old Eureka's business constituted about 80 percent of the national trading stamp printing market, and Old Eureka had been able to generate and maintain its large share of the market with only three salesmen covering the United States.

Prior to October 1, 1961, Old Eureka had received a trial order from the Atlantic & Pacific grocery store chain (A & P) for stamps for two or three of the A & P stores, and this was expected to eventually expand throughout the A & P chain nationally.

Old Eureka also produced a variety of other printed items, such as outsert advertising attached to the exterior of a product, special types of stationery, Christmas tags, cutouts, decorative booklets, catalogues, books, periodicals, fund-raising and commercial seals, and addressing labels.

Old Eureka operated very efficient high-speed machinery for processing its specialized printing work. The company's machinery had been recently modernized and was essentially new equipment. In this respect the capacity of the plant was such that a considerable increase in production volume could have been obtained from existing plant and equipment, with no further replacement or additional machinery.

Old Eureka's position in the market was enhanced by its extensive security system which included safety watermarked paper, serial numbered stamps, inventory controls, bonded warehouses, closed-circuit television, and security guards. In addition, Old Eureka had developed an automatic stamp-coiling process which facilitated the dispensing of stamps at supermarkets by merely dialing the price of the goods purchased on the stamp dispenser device.

Litton expected Old Eureka's excellent reputation and position in the market to assure its particular progress along with the anticipated growth of the trading stamp market in general. Litton also

considered the other printing operations of Old Eureka capable of expansion with the addition of sales personnel and development of a promotional organization. Further, given the modern equipment in operation, with its existing capacity for additional production, Litton expected that additional capital investments would not be necessary to accommodate anticipated growth.

Taxable income reported by Old Eureka in 1959, 1960, and 1961 was approximately $1,800,000 in each year.

On October 9, 1961, Litton entered into an Agreement and Plan of Reorganization with Old Eureka. Under the agreement, either Litton or a wholly owned subsidiary of Litton would acquire substantially all of the assets of Old Eureka in exchange for voting common stock of Litton. Litton agreed that it would deliver or cause to be delivered to Old Eureka 3 shares of Litton stock per each share of class A common stock of Old Eureka issued and outstanding at the date of closing and 3 shares of Litton stock per each share of class B common stock of Old Eureka issued and outstanding at the date of closing. Litton also gave an understanding whereby Litton or its wholly owned subsidiary would assume and agree to pay or discharge certain of Old Eureka's liabilities and obligations.

Litton is a large, diversified corporation, and, from an operational and management viewpoint, its operations are divided into groups. Each group is composed of certain subsidiaries under the general supervision of a group executive, who is an officer of the parent corporation, Litton. The group executive's function, in working with a particular subsidiary, is similar to that of a board of directors in providing long-range goals and strategic planning rather than day-to-day supervision.

The current operations of the subsidiary are directed by its own particular manager. It is Litton's philosophy that in order to encourage a proprietary attitude on the part of the manager, each subsidiary should be viewed as a separate entity whose operating executives are fully responsible for the subsidiary's performance as though they were running a company founded by themselves.

The subsidiary is furnished with a minimum amount of permanent capital judged necessary to conduct the business as if it were an autonomous entity. Any additional machinery, services or nonpermanent capital financing are provided on an arm's-length basis through loans or other forms of payment. This allows the subsidiary's performance to be measured subject to the normal financial constraints of an independent corporation. As independent corporations will often go beyond their stockholders for additional operating and capital funds, such constraints would include having the subsidiary required

to provide for the servicing of debt obligations in measuring its comparative performance.

In November of 1961, New Eureka was incorporated as a wholly owned subsidiary of Litton for the purpose of acquiring the assets of Old Eureka pursuant to the plan of reorganization. Litton subscribed to and paid $1,000 for 1 share of common stock of New Eureka as the initial capitalization.

New Eureka's board of directors included a senior vice president of Litton, a vice president of another Litton subsidiary, and the president of New Eureka who had also been president of Old Eureka.

The first meeting of the board of directors of New Eureka was held on November 24, 1961. The minutes of that meeting included the following resolution:

RESOLVED, that the officers of this corporation be and they hereby are authorized to do all acts necessary to implement the Agreement and Plan of Reorganization dated October 9, 1961 between Litton Industries, Inc. and Eureka Specialty Printing Company, a Pennsylvania corporation; that this corporation accept and receive the property, assets and business and assume the stated liabilities of Eureka Specialty Printing Company, a Pennsylvania corporation, at the transfer date pursuant to such Agreement and Plan of Reorganization; and

RESOLVED FURTHER, that the officers of this corporation be and they hereby are authorized to borrow from Litton Industries, Inc. such amounts as they deem necessary or advisable to carry out the obligations imposed upon this corporation under such Agreement and Plan of Reorganization and as may be required to carry on the business of this corporation; and

RESOLVED FURTHER, that the 183,555 shares of Litton Industries, Inc. $1 par value common stock to be issued to Eureka Specialty Printing Company, a Pennsylvania corporation, on the transfer date aforesaid be deemed and construed to constitute additional paid-in capital of this corporation to the extent of the present book value of the assets Eureka Specialty Printing Company, a Pennsylvania corporation, to be transferred to this corporation on the transfer date and that to the extent that the fair market value of such 183,555 shares of Litton Industries, Inc. common stock exceeds the amount that shall constitute such additional paid-in capital as above provided there shall be deemed to be created a debt from this corporation to Litton Industries, Inc. for such amount less $1,000.

Thus the essence of the reorganization transaction was for Litton to create a new subsidiary, New Eureka, with an initial capitalization of $1,000. Once the amount of Litton stock to be exchanged for Old Eureka's assets was determined (approximately $28 million), Litton would contribute to New Eureka's capital an amount of Litton stock equal to the book value of Old Eureka's assets to be acquired by New Eureka (approximately $9 million). This would capitalize New Eureka at an amount equal to the book value of assets to be acquired.

The balance of the amount of Litton stock (approximately $19 million) to be exchanged would then be sold to New Eureka, the purchase price due to Litton resulting in a loan or advance account owed by New Eureka to Litton.

New Eureka would then exchange all of the Litton stock for Old Eureka's assets, carrying over Old Eureka's basis in such assets to New Eureka, the balance being recorded as goodwill.

On November 30, 1961, in order to consummate the Agreement and Plan of Reorganization, 183,555 shares of Litton common stock, valued at $28,542,802.50, were transferred to Old Eureka by, or on behalf of, New Eureka. Such stock was made available to New Eureka by Litton pursuant to the provisions of the corporate resolution adopted at New Eureka's first board of directors meeting, a portion of the stock representing a contribution to New Eureka's capital, and a portion being sold to New Eureka on an advance account. On the same date, Old Eureka assigned all of its assets to New Eureka, and such assignment was accepted by New Eureka. Litton consented to the assignment on the same document. The employees of Old Eureka became the employees of New Eureka, and New Eureka continued without change a pension plan which had become effective on January 1, 1956, for Old Eureka.

New Eureka became part of the business equipment group of subsidiaries of Litton. Other subsidiaries in the group included Monroe Calculators, Kimbell Tag, Communications Papers, Cole Steel Office Equipment, Simon Adhesive, and Sweda Cash Register.

At the direction of the group comptroller of the Litton business equipment group, the secretary-treasurer of New Eureka was to make the following entries on New Eureka's books of record:

|  | Debit | Credit |
|---|---|---|
| Due from Litton | $1,000.00 | |
| Capital stock | | $1,000.00 |
| To record subscription for capital stock | | |
| Investment in Litton stock | 28,542,803.00 | |
| Advance from parent | | 19,316,417.81 |
| Paid-in surplus | | 9,226,385.19 |
| To record receipt of Litton stock in accordance with agreement | | |
| Net assets | 9,227,385.19 | |
| Goodwill | 19,315,417.81 | |
| Investment in Litton stock | | 28,542,803.00 |
| To record assets acquired in exchange of Litton stock | | |

The adjusted opening balance of New Eureka's "Advance from Parent" account was actually $19,315,417.31, an adjustment of $1,000 being made to exclude the initial capitalization erroneously included in the advance account as determined under the corporate resolution establishing the account. A 50-cent error was also corrected. On its own books of record, Litton recorded $19,315,417.31 as an amount due from New Eureka.

Although there was no formal written note, the indebtedness and its essential terms were evidenced in writing on the books of record of both companies and in a substantial amount of correspondence be-

tween New Eureka and Litton. Such evidence revealed the parties, the existence of a debt obligation, the amount thereof and payments thereon, the provision for interest, and were signed by officers of the respective parties.

There were no required monthly payments of principal, and the debt was payable on demand. However, based on Old Eureka's past earnings and annual cash flow of approximately $2 million to $3 million, and the anticipated ability of New Eureka to sustain and even increase the performance of the business, at the time the advance account was created the parties contemplated that New Eureka would be able to retire the advance within 10 years.

The provision for interest charged on the advance account was determined at an annual rate of 5¼ percent, computed on an exact day method of outstanding balance on the account. Although the interest was computed on the basis of daily outstanding balances, interest was payable annually and was paid or accrued on the last day of the fiscal year.

The prime rate of interest from August 23, 1960, to December 6, 1965, was approximately 4½ percent. During that period Litton was charged ¼ percent over the prime rate on its own obligations, or 4¾ percent. In turn, Litton's policy was to charge its subsidiaries ½ percent above that rate, or 5¼ percent. Thus, the 5¼-percent rate of interest charged New Eureka by Litton on the advance account was in accord with Litton's general policy regarding interest charged on loans to its subsidiaries.

The advance account was not subordinated to other creditors. While no property was assigned as collateral, Litton's 100-percent ownership of New Eureka was deemed sufficient security.

New Eureka could have borrowed $19,315,417 from sources other than Litton and in turn purchased this amount of stock from Litton with the cash. As a Litton subsidiary and with Litton's guarantee, New Eureka could have obtained a loan directly from a bank. As a separate entity, it could have obtained such an amount from private lenders on a fixed-debt basis. Alternatively, it could have raised half the amount from commercial banking sources and half from private sources. If New Eureka had borrowed from unrelated parties it would have paid approximately the same rate of interest charged by Litton, although the schedule of repayment would probably have been more definitely fixed.

In the latter part of 1963, the trading stamp industry went into a high denomination stamp, whereby a single stamp could be issued on a dollar sale rather than 10 stamps of 10-cent denomination each. Accordingly, even though the volume of business of the companies using the trading stamps increased, the volume of stamps used by

.such companies decreased. Consequently, there was a significant decrease in New Eureka's total sales in 1963, continuing through 1965, after which time sales generally began to increase again.[2]

New Eureka began repayments on the advance account in December of 1961. At certain times Litton made readvances to New Eureka on the account, mainly to "cover" the interest payments made by New Eureka to Litton. A summary of the payments of principal and interest on the advance account by New Eureka to Litton and readvances by Litton to New Eureka, during the period at issue, is as follows:

| Date | Payments on advance account | Interest payments | Readvances on account | Balance of advance account |
|---|---|---|---|---|
| 12/1/61 | | | | $19,315,417.31 |
| 12/18/61 | $100,000.00 | | | |
| 2/5/62 | 100,000.00 | | | |
| 4/6/62 | 200,000.00 | | | |
| 4/23/62 | 100,000.00 | | | |
| 5/8/62 | 100,000.00 | | | |
| 5/16/62 | 100,417.31 | | | |
| 5/17/62 | 100,000.00 | | | |
| 7/31/62 | 173,000.00 | | | |
| 7/31/62 | | $658,434.73 | | |
| 7/31/62 | | | $658,000.00 | |
| Total for year ended: 7/31/62 | 973,417.31 | 658,434.73 | 658,000.00 | 19,000,000.00 |
| 8/30/62 | 100,000.00 | | | |
| 9/10/62 | 200,000.00 | | | |
| 9/19/62 | 100,000.00 | | | |
| 9/25/62 | 200,000.00 | | | |
| 9/28/62 | 100,000.00 | | | |
| 10/8/62 | 100,000.00 | | | |
| 10/10/62 | | | 200,000.00 | |
| 11/19/62 | 100,000.00 | | | |
| 12/14/62 | 400,000.00 | | | |
| 2/18/63 | 150,000.00 | | | |
| 2/25/63 | 100,000.00 | | | |
| 4/3/63 | 100,000.00 | | | |
| 4/24/63 | | | 100,000.00 | |
| 5/14/63 | | | 100,000.00 | |
| 6/18/63 | 100,000.00 | | | |
| 6/25/63 | 100,000.00 | | | |
| 7/3/63 | 100,000.00 | | | |
| 7/31/63 | 5,231.73 | | | |
| 7/31/63 | | 944,768.27 | | |
| 7/31/63 | | | 950,000.00 | |
| Total for year ended: 7/31/63 | 1,955,231.73 | 944,768.27 | 1,350,000.00 | 18,394,768.27 |

[2] Although the following schedule does not provide for exact comparisons to the initial periods because of fiscal yearend changes, even an approximate annualization of the sales clearly shows a comparative decrease in sales beginning in 1963 and continuing through 1965:

|  | *Total sales* *(in thousands of dollars)* |
|---|---|
| *Old Eureka* | |
| 1/1/60 to 12/31/60 | $16,303 |
| 1/1/61 to 11/30/61 | 14,942 |
| *New Eureka* | |
| 12/1/61 to 7/31/62 | 17,018 |
| 8/1/62 to 7/31/63 | 15,556 |
| 8/1/63 to 7/31/64 | 13,296 |
| 8/1/64 to 7/31/65 | 12,033 |
| 8/1/65 to 7/31/66 | 13,919 |
| 8/1/66 to 7/31/67 | 14,836 |
| 8/1/67 to 7/31/68 | 15,659 |
| 8/1/68 to 7/31/69 | 17,875 |

| Date | Payments on advance account | Interest payments | Readvances on account | Balance of advance account |
|---|---|---|---|---|
| 8/12/63 | $100,000.00 | | | |
| 8/27/63 | 194,768.27 | | | |
| 9/10/63 | 100,000.00 | | | |
| 9/17/63 | 400,000.00 | | | |
| 10/14/63 | | | $300,000.00 | |
| 10/28/63 | 250,000.00 | | | |
| 12/3/63 | 100,000.00 | | | |
| 12/9/63 | 50,000.00 | | | |
| 12/23/63 | 250,000.00 | | | |
| 12/24/63 | 150,000.00 | | | |
| 2/4/64 | 100,000.00 | | | |
| 2/25/64 | 100,000.00 | | | |
| 3/24/64 | 150,000.00 | | | |
| 4/18/64 | 100,000.00 | | | |
| 4/20/64 | 150,000.00 | | | |
| 5/5/64 | 175,000.00 | | | |
| 6/22/64 | 200,000.00 | | | |
| 7/20/64 | 990,000.00 | | | |
| 7/20/64 | 250,000.00 | | | |
| 7/31/64 | | $894,031.91 | | |
| 7/31/64 | | | 895,000.00 | |
| Total for year ended: 7/31/64 | 3,809,768.27 | 894,031.91 | 1,195,000.00 | $15,780,000.00 |

Included in the interest expense deductions on New Eureka's Federal corporate income tax returns for the following periods were deductions for the following amounts as interest expense on the advance account:

| Taxable period | Amount |
|---|---|
| Dec. 1, 1961, to July 31, 1962 | [3] $658,424.76 |
| Aug. 1, 1962, to July 31, 1963 | 944,768.27 |
| Aug. 1, 1963, to July 31, 1964 | [3] 894,599.91 |

Litton included these amounts as interest income in determining its gross income and reported taxable income in periods covering each of the periods indicated.

The Internal Revenue Service first challenged the propriety of the interest expense deductions during the fiscal year ended July 31, 1965. Because of the uncertainty of the tax status of the transactions relating to the advance account, New Eureka made no payments of principal or interest to Litton subsequent to July 31, 1964. However, New Eureka continued to accrue interest expense, and Litton continued to accrue interest income on the advance account.

In his statutory notice of deficiency the respondent determined that the advance account was not an indebtedness recognizable for Federal income tax purposes and disallowed the claimed deductions for interest expense thereon.

### ULTIMATE FINDING

New Eureka's advance account was a bona fide indebtedness to Litton.

---

[3] Although not in agreement with the amounts scheduled, *supra*, as interest paid, these are the figures stated in the pleadings of both parties as the proper amounts of the asserted deductions at issue. Accordingly, there is no issue as to the proper *amount* of the asserted interest expense deduction.

376

As previously indicated, the only issue remaining for our decision is whether New Eureka was entitled to interest expense deductions on the purported advance account debt obligation during the years involved herein. Determinative of this issue is whether the $19,315,417.31 portion of the total $28,542,802.50 of Litton stock transferred to New Eureka by Litton was an additional capital investment or whether it was transferred as a sale resulting in the creation of a debt obligation from New Eureka to Litton.

Respondent has raised no issue challenging the propriety of the section 368(a)(1)(C) reorganization which followed the incorporation of New Eureka. Respondent's only contention is that the transaction preceding the reorganization did not create a debt obligation between New Eureka and Litton upon which New Eureka could properly deduct interest expense.

Although the debt-equity issue has generated a proliferation of decided cases, there has been no singular approach with a clearly defined set of standards to be uniformly applied, and the results of each case usually depend upon the individual facts and circumstances therein. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1946). However, most of the decisions on this issue are ultimately bottomed on a comparison of the purported debt at issue with a list of factors which are generally regarded as identifying the characteristic differences between debt and equity for income tax purposes. *Fin Hay Realty Co.* v. *United States*, 398 F. 2d 694 (C.A. 3, 1968) ; *J. S. Biritz Construction Co.* v. *Commissioner*, 387 F. 2d 451 (C.A. 8, 1967) ; *O. H. Kruse Grain & Milling* v. *Commissioner*, 279 F. 2d 123 (C.A. 9, 1960) ; *Foresun, Inc.*, 41 T.C. 706 (1964), affd. 348 F. 2d 1006 (C.A. 6, 1965). The difficulty lies in the variety of related factors enumerated by the various courts, the apparent unequal weight accorded in the application of different or even the same factors considered, and the distinction often drawn between merely "evidentiary" factors and "ultimately determinative" factors.[4]

Given the wide range of approaches that have been used in identifying and applying these factors, we will look to the Court of Appeals for the Ninth Circuit in order that our grounds for decision will be consistent with the views of that court on this issue.[5]

In *A. R. Lantz Co.* v. *United States*, 424 F. 2d 1330 (C.A. 9, 1970), the Court of Appeals responded to the taxpayer's argument that formal documentation of a debt should control for tax purposes unless a sham, a tax subterfuge, or a transaction wholly without substance is shown. After rejecting this approach, the court first indicated that the

---

[4] For an excellent perspective on the debt-equity issue, see Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal." 26 Tax L. Rev. 369 (1971).

[5] An appeal in this case would lie to the Ninth Circuit.

resolution of a debt-equity issue is a question of fact. Secondly, it indicated that factors such as formal documentation were insufficient in themselves to establish the existence of a valid debt for tax purposes. The court instructed that the trier of fact must look beyond "objective" expressions of intent to create a debt and should ascertain the "subjective" expressions of intent to find what was really in the minds of the parties in light of the substantive economic reality of the transaction.[6]

In view of the many decided cases in this area, we think the determinative question, to which an evaluation of the various independent factors should ultimately point, is as follows: Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?

In resolving this question, we have considered no single factor as controlling. Rather, our evaluation of the various factors has provided us with an evidential basis upon which we have made our ultimate factual determination that a bona fide indebtedness existed.

First, New Eureka had adequately evidenced an "objective" expression of its intention to create a debt, pursuant to the formal documentation of a debtor-creditor relationship, although this alone is insufficient to establish a valid debt for tax purposes. See *A. R. Lantz Co.* v. *United States, supra.*

While it is true that the parties executed no note or other singular debt instrument, we do not consider the absence of such instrument a significant factor in this particular case. It is quite clear that a valid debt may exist between parties even where no formal debt instrument exists. *American Processing & Sales Co.* v. *United States,* 371 F. 2d 842 (Ct. Cl. 1967); *Byerlite Corporation* v. *Williams,* 286 F. 2d 285 (C.A. 6, 1960); *Rowan* v. *United States,* 219 F. 2d 51 (C.A. 5, 1955); *Wilshire & West. Sandwiches* v. *Commissioner,* 175 F. 2d 718 (C.A. 9, 1949); *Maloney* v. *Spencer,* 172 F. 2d 638 (C.A. 9, 1949); *Malone & Hyde, Inc.,* 49 T.C. 575 (1968). This is particularly true in the case of related parties since "Formal debt paraphernalia of this type in a closeknit family of corporate cousins are not as necessary to insure re-

---

[6] Although the terms "objective" intent and "subjective" intent, as used by various courts, have often produced definitional conflicts, at least one commentator has attempted to reconcile what appears to be a semantic difference only:

"The semantic difficulty encountered with the term 'objective intent' is illustrated in *S. P. Realty Co.,* 27 T.C.M. 764, 766 (1968), in which the opinion as first released read, 'we must also look beyond the *subjective* intent of the parties to determine their *real* intent from all the relevant circumstances,' but was later amended to read, 'we must also look beyond the *objective* intent of the parties to determine their *subjective* intent from all the relevant circumstances.' (Emphasis added.) Whether the intent sought is viewed as 'objective,' 'real' or 'subjective,' however, it must be 'objectively ascertained' from sources other than, or in addition to, the formal declarations. *A. R. Lantz Co.* v. *United States,* 424 F. 2d 1330, 1333 (9th Cir. 1970). [Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," *supra* at 458, fn. 482.]"

payment as may be the case between unrelated entities." *American Processing & Sales Co.* v. *United States, supra.* Indeed, the existence of a debt instrument in such a case is of little weight without the accompaniment of other factors. *American Processing & Sales Co.* v. *United States, supra.*

At its first meeting, New Eureka's board of directors adopted a resolution which specifically authorized and directed the establishment of the advance account as a debt obligation. The existence of the purported debt obligation was expressed on the books of record of both New Eureka and Litton, each party recording the transactions and balances thereof as being on debt accounts. Correspondence between officers and employees representing each party consistently recognized the existence of the advance account as a debt and the establishment of its terms and payments thereon.

With respect to the maturity of the obligation, the advance account was payable on demand, and such debt obligations have been sustained as having a due date which is within the control of the creditors. *J. S. Biritz Construction Co.* v. *Commissioner, supra; Byerlite Corporation* v. *Williams, supra; Malone & Hyde, Inc., supra.*

Further, the advance account was merely part of the general indebtedness of New Eureka and was not subordinated to the claims of general creditors of the corporation.

The advance account bore an interest rate of 5¼ percent, and the evidence establishes the reasonableness of this interest rate in light of the prevailing interest rates in the financial community at that time.

As we have stated, these formal indicia of debt are not in themselves sufficient to establish a bona fide indebtedness for the purposes of section 163. However, the formal indicia evidencing the advance account as a debt are favorably supported by other, more persuasive, factors which we have considered.

We think that there is adequate evidence, in addition to the formal indicia of debt, that the parties genuinely intended that the advance account create a debt obligation, payable in any event and not merely at the risk of the business, that the parties' actions conformed to that intent, and that the debtor-creditor relationship was economically reasonable.

One factor tending to show that repayment of the advance account was not solely dependent on the risk of the business is that the ultimate application of the stock obtained in creating the advance account was part of the acquisition of a complete, existing enterprise with substantially valuable assets, already established in a dominant position in its market and generating significant operating profits. *Malone*

& *Hyde, Inc., supra.* This was not a speculative venture. This was the financing of a proven operation with existing adequate capital assets and without the requirements of significant further development costs.

Another factor considered helpful in measuring the reasonableness of the purported debt has been whether the corporation could have obtained debt financing on similar terms from an independent creditor. *Fin Hay Realty Co.* v. *United States, supra; Jack Daniel Distillery* v. *United States,* 379 F. 2d 569 (Ct. Cl. 1967) ; *Nassau Lens Co.* v. *Commissioner,* 308 F. 2d 39 (C.A. 2, 1962). Petitioner presented evidence to the effect that New Eureka could have obtained the $19,315,417.31 from outside sources in order to purchase that amount of stock from Litton for purposes of effecting the subsequent reorganization. While New Eureka would probably have needed Litton's guarantee in order to borrow the full amount directly from a bank, New Eureka could have obtained, even as a separate entity, the full amount from private lenders, or, alternatively one-half each from commercial banking and private sources.

Although the evidence indicates that the terms of such outside financing would probably have been more strict than the terms of the obligation to Litton, we are not here applying a mechanical test of absolute identity between the advance account and what debt actually or hypothetically would have been available to New Eureka.[7] In short, we think the terms of the advance account were not a patent distortion of what would normally have been available to New Eureka as independent debt financing, but were reasonably comparable to such debt acquired in an arm's-length transaction. See *Nassau Lens Co.* v. *Commissioner, supra.*

Another factor that is obviously in petitioner's favor, but one to which we have not afforded great significance, is New Eureka's ratio of debt to equity, which was approximately 2:1 upon the transfer of Litton stock to New Eureka. Although a "good" debt-equity ratio is no safe harbor for petitioner,[8] this relatively low ratio does counter any suggestion of thinness or patent inadequacy of a normal capitalization. Cf. *J. S. Biritz Construction Co.* v. *Commissioner, supra.*

On the other hand, the fact that New Eureka's debt-equity structure was tied to the exchange value of Litton stock and the book value of Old Eureka's assets is not in itself determinative of a reasonably adequate capital structure. Such a determination based on an accumu-

---

[7] See, for example, *C. M. Gooch Lumber Sales Co.,* 49 T.C. 649 (1968) ; *Malone & Hyde, Inc.,* 49 T.C. 575 (1968) ; *Charles E. Curry,* 43 T.C. 667 (1965) ; *Motel Co.,* T.C. Memo. 1963–174, affd. 340 F. 2d 445 (C.A. 2, 1965).

[8] See *Gooding Amusement Co.* v. *Commissioner,* 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957), wherein the court determined that at the purported debt was actually equity despite a nearly 1:1 ratio of the debt in question to the equity of the corporation.

lation of historical investments, profits, and accounting conventions is not necessarily a meaningful constraint of the sufficiency of capital and debt capacity of New Eureka.

Still another factor which weighs in petitioner's favor is the reasonable expectation, at the inception of the advance account, of repayment of the account based on the established financial history of Old Eureka and the prospects for continued success of those operations by New Eureka. At the time of the creation of the advance account, no substantial capital expenditures were contemplated in the future, and it was reasonably expected that even without an increase in sales the business would continue to produce sufficient cash flow and profits to adequately service the debt. See *Jack Daniel Distillery* v. *United States*, *supra; American Processing & Sales Co.* v. *United States*, *supra; Nassau Lens Co.* v. *Commissioner*, *supra; Miller's Estate* v. *Commissioner*, 239 F. 2d 729 (C.A. 9, 1956); *Wilshire & West. Sandwiches* v. *Commissioner*, *supra; Malone & Hyde, Inc.*, *supra.*

Although New Eureka's financial performance subsequently met with some difficulty upon the advent of high denomination trading stamps and although Litton made certain readvances to New Eureka to "cover" interest payments on the advance account, there was still an annual net reduction in the balance of the advance account from its inception through the years at issue. Furthermore, as our findings of fact show, the repayments on the account were regularly made beginning shortly after the establishment of the account. In the fiscal year ended in 1962, New Eureka made principal repayments of $973,417.31, an interest payment of $658,434.73, with a readvance from Litton of $658,000, resulting in a net reduction of the principal balance by $315,417.31. In the fiscal year ended in 1963, New Eureka made principal repayments of $1,955,231.73, an interest payment of $944,768.27, with readvances from Litton of $1,350,000, resulting in a further net reduction of the principal balance by $605,231.73. In the fiscal year ended in 1964, New Eureka made principal repayments of $3,809,768.27, an interest payment of $894,031.91, with readvances of $1,195,000, resulting in a further net reduction of the principal balance by $2,614,768.27.

Thus, during the first 3 years,[9] the net cash outflow from New Eureka to Litton relative to the advance account discharged all stated interest charges, and despite the periodic readvances on the account,

---

[9] We do not consider as particularly detrimental to petitioner's case the fact that payments of principal and interest were suspended when the Internal Revenue Service challenged the propriety of the debt. The validity of the obligation to repay was not terminated by the exercise of caution until the tax status of the transactions could be determined. Cf. *Piedmont Corporation* v. *Commissioner*, 388 F. 2d 886 (C.A. 4, 1968). Moreover, New Eureka and Litton continued to accrue interest expense and interest income on the advance account, respecting the nature of the account as a debt obligation.

did indeed reduce the net principal balance thereof by $3,535, 417.31.

This continuous repayment resulting in a substantial net reduction of the advance account balance in addition to discharging all interest (viewed either as currently discharged or by subsequent discharge of readvances "covering" the interest payment) is significant evidence that the parties' substantive actions complied with the form of the transaction as establishing a debtor-creditor relationship. See *Jack Daniel Distillery* v. *United States, supra.*

We are aware that since Litton was New Eureka's sole stockholder we should view the purported debtor-creditor relationship with closer scrutiny than if the debt obligation was in substantial disproportion to the equity holding. *Fin Hay Realty Co.* v. *United States, supra; Malone & Hyde, Inc., supra.* However, it is just as clear that where such scrutiny has been exercised, the fact of proportional identity of interest between stockholders and creditors, particularly where a sole stockholder is involved, does not preclude the existence of a valid debt. *J. S. Biritz Construction Co.* v. *Commissioner, supra; Jack Daniel Distillery* v. *United States, supra; Byerlite Corporation* v. *Williams, supra; Wilshire & West. Sandwiches* v. *Commissioner, supra; Malone & Hyde, Inc., supra.*

Moreover, the identity of interest of Litton as sole stockholder and as creditor serves to justify the apparent lack of a security arrangement backing up the advance account. While the absence of taking a security interest on a debt transaction has sometimes been considered as tending to negative a genuine intention to create a debt, the fact that Litton had a 100-percent stock interest in New Eureka adequately substitutes for an independent security interest, or at least minimizes the importance thereof. *J. S. Biritz Construction Co.* v. *Commissioner, supra; American Processing & Sales Co.* v. *United States, supra; Wilshire & West. Sandwiches* v. *Commissioner, supra; Malone & Hyde, Inc., supra.*

In *Lantz* the Court of Appeals identified 11 factors which it deemed relevant with respect to the ultimate factual determination of the debt-equity issue, emphasizing that the objective expressions of intent (i.e., the formalities of documentation such as a debt instrument, provision for interest and maturity date) were not the most important factors, but must be supported by evidence of the substantive economic reality of the purported debt. We think our analysis of the factors bearing on this question is consistent with *Lantz*.

Accordingly, we hold that New Eureka's advance account was a bona fide indebtedness to Litton and therefore New Eureka is entitled to interest expense deductions thereon.

*Decision will be entered under Rule 50.*