ALAN E. AND HARRIET R. LEWIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lewis v. Commissioner
Docket No. 17601-90
United States Tax Court
T.C. Memo 1992-391; 1992 Tax Ct. Memo LEXIS 409; 64 T.C.M. (CCH) 117; July 14, 1992, Filed *409 Decision will be entered under Rule 155. For Petitioners: David R. Andelman and Edward F. Fay. For Respondent: Charles Maurer, Jr., and Robert M. Finkel. WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)/(a)(1)(A)
6653(a)(2)/(a)(1)(B)
6661
1983
$ 122,895
$ 6,145
[1]
$ 30,724
1984
614,321
30,716
[1]
153,508
1985
21,259
1,063
[1]
N/A  1986
7,768
388
[1]
N/A  All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues remaining for decision are: (1) Whether petitioners failed to report income in taxable year 1984 in the amount of $ 1,062,500 as petitioner husband's distributive share *410 of income derived from a trust entitled the Belkin Trust. We hold that they did. (2) Whether petitioners failed to report $ 255,000, $ 85,000, and $ 220,000 as ordinary income in taxable years 1983, 1984, and 1986, respectively, that petitioner husband derived from a covenant not to compete. We hold that they did. (3) Whether petitioners are liable for the additions to tax for negligence and for substantial understatement of income tax as determined by respondent. We hold that they are. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated in this opinion by reference. At the time petitioners filed their petition they resided in Boston, Massachusetts. For purposes herein, the term "petitioner" shall refer to Alan E. Lewis. Petitioners reported their income and expenses on the cash basis method of accounting for each of the years in issue. TNT, ILT, the Belkin Trust, and the Lewis Trust
In January 1974, petitioner and Mr. Steven Belkin (Belkin) organized Trans National Travel, Inc. (TNT), a U.S. corporation. Petitioner owned 30 percent of TNT and held the position of executive vice president. Belkin owned 60 percent of TNT and held the position *411 of chairman of the board. The remaining stock of TNT was owned by five minority shareholders. In November 1974, Belkin established an irrevocable trust in the Cayman Islands entitled the Belkin Trust. The Belkin Trust had 22 named trust beneficiaries, including petitioner and Belkin. Petitioner's and Belkin's unnamed children were also designated as trust beneficiaries. A Cayman Islands entity entitled the Cayman International Trust Co. (CITCO) was appointed original trustee. As trustee, CITCO had the power to distribute income to any beneficiary but was required to consult with Belkin prior to making such distributions. The Belkin Trust maintained a bank account in the Cayman Islands. Simultaneous to the establishment of the Belkin Trust, petitioner and Belkin organized a corporation in the Cayman Islands entitled International Local Tours, Ltd. (ILT). The Belkin Trust owned 100 percent of ILT's stock. Petitioner and Belkin controlled the business activities of ILT. ILT was organized to serve as a vehicle for petitioner's and Belkin's international business opportunities. Mr. Dennis O'Connor (O'Connor), an attorney with Pollack, O'Connor, and Jacobs, assisted in organizing *412 ILT. O'Connor was unaware of whether ILT had a business office, a checking account, or employees, or was engaged in any actual business operations. However, during the years in issue, ILT had an office address, maintained a bank account in the Cayman Islands, had a Cayman Islands telephone number, and had at least two directors and three officers. On December 31, 1980, ILT had a $ -0- balance in its Cayman Islands bank account. Between January 1981 and December 1984, amounts were credited to and/or deposited into ILT's Cayman Islands bank account totaling approximately $ 4.5 million. The record does not adequately establish the source or nature of these amounts. In May 1977, petitioner and Belkin established another irrevocable trust in the Cayman Islands entitled the Lewis Trust. The Lewis Trust had the same beneficiaries and trustee as the Belkin Trust. The trustee had the power to distribute income to any beneficiary but was required to consult with petitioner prior to making such distributions. The Lewis Trust maintained a bank account in the Cayman Islands. Income From Sale of Optional Tours
TNT engaged in the business of developing and selling European tour *413 packages to U.S. residents. These tour packages included air transportation, hotel accommodations, some ground transportation in the destination country, and a guided local city tour. Upon the arrival of TNT's passengers in their destination city, TNT agents sold them additional daily guided tours, such as bus trips within and without the destination country. These daily guided tours were organized by TNT agents. Hereinafter, these daily guided tours will be referred to as optional tours. From June 1974 until November 1974, TNT sales agents forwarded the net proceeds received from the sale of optional tours to TNT. In November 1974, TNT forwarded the accumulated proceeds to ILT in the Cayman Islands. After November 1974, TNT agents deposited the proceeds weekly into a bank account located in the destination country whereupon they were transferred to ILT in the Cayman Islands. Petitioner testified that ILT's only source of income was from the sale of optional tours. After the establishment of the Lewis Trust in 1977, ILT transferred one-half of the proceeds it received from the sale of optional tours to the Lewis Trust and one-half to the Belkin Trust upon receipt of such by *414 ILT. The record does not indicate whether ILT distributed any of the proceeds it received from the sale of optional tours prior to the establishment of the Lewis Trust. After 1980, these optional tour proceeds were not transferred to ILT but instead were deposited into a Swiss bank account maintained by a foreign subsidiary of TNT. Between 1974 and 1980, the optional tours produced income of $ 4-6 million. Petitioners' Tax Treatment of Optional Tour Income
Petitioners did not include any of the amounts received by ILT, the Belkin Trust, or the Lewis Trust from the sale of optional tours in their U.S. taxable income in taxable years 1974 through 1980. Prior to the establishment of the Lewis Trust, petitioner sought O'Connor's legal advice regarding the tax consequences of the ILT optional tours transactions for himself and the Lewis Trust. O'Connor advised petitioner that no gift tax consequences would result upon the contribution of assets to the Lewis Trust, that the Lewis Trust was not a grantor trust within sections 671 through 679, that the Lewis Trust itself would not be subject to U.S. taxation on its foreign-source income, and that as a U.S. trust beneficiary, *415 petitioner would not be subject to U.S. income tax in the year the trust earned income but instead would be subject to such in the year such income was distributed to him. In 1986, petitioner retained the law firm Widett, Slater & Goldman to reexamine whether the Lewis Trust was properly established and whether there were any income tax consequences to him vis-a-vis the Lewis Trust. This firm advised petitioner that the Lewis Trust was a grantor trust within sections 671 through 679 and that petitioner should have included all income derived by the trust in his U.S. taxable income. The firm advised petitioner to file amended returns for the taxable years in which the period of limitations was still open. In late 1986, on the advice of the Widett law firm, petitioners filed joint amended U.S. individual income tax returns for taxable years 1980 through 1985. The Widett law firm prepared each of these amended returns. In each of these amended returns, petitioners reported additional interest income received from the Lewis Trust in taxable years 1980 through 1985. The Widett law firm transmitted these amended returns with a letter informing the IRS that the Lewis Trust was a grantor *416 trust and that income earned by the trust was properly includable in petitioners' U.S. taxable income. In 1988, petitioners filed a joint amended U.S. individual income tax return for taxable year 1986 in which they reported additional interest income received from the Lewis Trust in 1986 in the amount of $ 270,717. This amended return was not prepared by the Widett law firm. Charlesgate Loan and Taunton Loan [1] Transactions a. Charlesgate Loans In 1975, petitioner and Belkin established Charlesgate West Associates (Charlesgate Associates). Charlesgate Associates was a U.S. limited partnership in which Belkin was the general partner and petitioner the limited partner. In 1975, Charlesgate Associates purchased a building from TNT for $ 800,000 which was used by TNT as its business headquarters. Charlesgate Associates financed this purchase by *417 borrowing the sums from TNT. In the late seventies, Belkin and petitioner arranged for ILT to "lend" money to Charlesgate Associates. Petitioner's and Belkin's attorney, O'Connor, recommended that for tax purposes the "loans" be made through a Netherlands entity and then to Charlesgate Associates. The tax advantages of structuring the transaction in this manner were that Charlesgate Associates was not required to withhold U.S. income tax on interest payments made to a Netherlands entity and the Netherlands entity was not required to withhold taxes on interest payments made to a Cayman Islands entity, e.g., ILT. In 1976, ILT transferred $ 800,000 to a Cayman Islands entity entitled Gran Compania De Comercio (Gran Compania) whereupon Gran Compania transferred $ 800,000 to its wholly owned Netherlands Antillean subsidiary Windikip Financieringsmaatschappij B.V. (Windikip). Thereafter, Windikip transferred $ 800,000 to Charlesgate Associates. ILT, Gran Compania, Windikip, and Charlesgate Associates characterized these transfers as loans between the different entities. Each entity entered into written loan agreements indicating that the entire principal balance of $ 800,000 was *418 due on October 1, 1991, with interest payable quarterly at 10-12 percent beginning July 1, 1977. The loan between Charlesgate Associates and Windikip was secured by a mortgage on the Charlesgate property, was personally guaranteed by petitioner and Belkin's wife, and the principal amount of $ 800,000 could be reduced upon Windikip's agreement thereto. This above-referenced mortgage was released by Windikip on April 3, 1984. The proceeds of the transfer from ILT to Charlesgate Associates via Gran Compania and Windikip were distributed to TNT to pay back the loan extended by TNT for the purchase of the Charlesgate building. In 1978, ILT transferred an additional $ 600,000 to Gran Compania whereupon Gran Compania transferred $ 600,000 to Windikip. Thereafter, Windikip transferred $ 600,000 to Charlesgate Associates. Again, ILT, Gran Compania, Windikip, and Charlesgate Associates characterized these transfers as loans between the different entities. The record contains no written loan agreements between ILT and Gran Compania or between Gran Compania and Windikip. The record does contain a written loan agreement between Windikip and Charlesgate Associates indicating that the entire *419 principal balance of $ 600,000 was due on October 1, 1991, with interest payable quarterly at 12 percent beginning July 1, 1978. This loan agreement was secured by a mortgage on the Charlesgate building, and the principal amount of $ 800,000 could be reduced upon Windikip's consent thereto. Windikip released this above-referenced mortgage on April 3, 1984. The $ 600,000 transferred from ILT to Charlesgate Associates via Gran Compania and Windikip was equally distributed to petitioner and Belkin and used by them to purchase personal residences. For reference purposes, the above-referenced transfers in the amounts of $ 800,000 and $ 600,000 between ILT, Gran Compania, Windikip, and Charlesgate Associates, will hereinafter be referred to collectively as the Charlesgate loans. Gran Compania and Windikip would not have entered into the Charlesgate loan transactions had ILT not been the initial supplier of the loan proceeds. The Charlesgate loans could have been extended indefinitely at petitioner's and Belkin's option. At the time the loan transactions were entered into, petitioner and Belkin had no intention of repaying the $ 800,000 and the $ 600,000 to ILT. Petitioners did not *420 report any portion of the Charlesgate loans as income in taxable years 1976 or 1978, the years in which the proceeds were received by Charlesgate Associates. b. Taunton Loan In 1978, petitioner and Belkin established Taunton Boulevard Associates (Taunton Associates). Taunton Associates was a U.S. limited partnership in which Belkin was the general partner and petitioner the limited partner. In 1978, Taunton Associates purchased a warehouse located in Taunton, Massachusetts, for $ 675,000. Taunton Associates financed the purchase of this warehouse by borrowing the sums from TNT. Petitioner and Belkin thereafter arranged for ILT to "lend" money to Taunton Associates via a Netherlands entity. In May 1980, ILT transferred $ 675,000 to a Netherlands Antillean company entitled Mido Capital Venture Co. N.V. (Mido), whereupon Mido transferred $ 675,000 to a Netherlands Antillean trust entitled Bristol Realty Trust (Bristol Realty). Thereafter, Bristol Realty transferred $ 675,000 to Taunton Associates. ILT, Mido, Bristol Realty, and Taunton Associates characterized these transfers as loans between the different entities. Each entity entered into written loan agreements indicating *421 that the entire principal balance of $ 675,000 was due on May 1, 1990, with interest payable quarterly at varying rates of interest beginning August 1, 1980. The loan between Taunton Associates and Bristol Realty was secured by a mortgage on the Taunton warehouse, and its principal of $ 675,000 could be reduced upon Bristol Realty's consent thereto. The $ 600,000 transferred from ILT to Taunton Associates via Mido and Bristol Realty was used by Taunton Associates to repay the loan extended by TNT for the purchase of the Taunton warehouse. For reference purposes, the above-referenced transfers in the amount of $ 675,000 between ILT, Mido, Bristol Realty, and Taunton Associates will hereinafter be referred to collectively as the Taunton loan. Mido and Bristol Realty would not have entered into the Taunton loan transactions had ILT not been the initial supplier of the loan proceeds. The Taunton loans could have been extended indefinitely at petitioner's and Belkin's option. At the time the loan transactions were entered into, petitioner and Belkin had no intention of repaying the $ 675,000 to ILT. Petitioners did not report any portion of the Taunton loan as income in taxable *422 years 1980, the year in which the proceeds were received by Taunton Associates. Petitioner stated that pursuant to his and Belkin's separation agreement in 1983 which is discussed more fully infra pp. 13-16, Belkin obtained sole possession of the Charlesgate building, and petitioner obtained sole possession of the Taunton warehouse. Petitioner further stated that to equally distribute his and Belkin's joint equity interest in these properties, Belkin independently obtained refinancing for the Charlesgate building, and petitioner independently obtained refinancing for the Taunton warehouse, and that thereafter these proceeds were equally distributed to petitioner and Belkin via the Lewis Trust and Belkin Trust. Events Subsequent to Charlesgate and Taunton Loans
In April 1984, $ 1,450,000 was deposited into ILT's Cayman Islands bank account. In May 1984, ILT transferred $ 1.4 million to the Belkin Trust whereupon the Belkin Trust transferred $ 725,000 to the Lewis Trust. In November 1984, $ 708,658 was deposited in ILT's Cayman Islands bank account. Simultaneously, ILT transferred $ 708,658 to the Belkin Trust whereupon the Belkin Trust transferred $ 354,329 to the Lewis *423 Trust. The May deposit of $ 725,000 and $ 337,500 of the November deposit into the Lewis Trust, a total of $ 1,062,500, will hereinafter be referred to as the 1984 deposits. Petitioners filed an original and an amended U.S. individual income tax return for 1984. Petitioners did not report the 1984 deposits [2] as income on either of these returns. Petitioner stated that he did not do so because he was advised by the Widett law firm that these deposits represented taxable income he received in the seventies which he should have reported in prior years. An attorney at the Widett law firm stated that he did not advise petitioner to include the 1984 deposits in his 1984 taxable income because petitioner informed him that they represented proceeds received upon the repayment of a loan. 1983 Redemption of *424 Petitioner's Stock
In 1980, TNT reorganized and became Trans National Group Services, Inc. (TNGS). Upon this reorganization, petitioner and TNT's six other shareholders exchanged their shares of stock in TNT for an equal number of shares of stock in TNGS, having the same value, rights, and preferences as their TNT stock. In August 1983, petitioner, Belkin, and TNGS entered into a stock purchase and noncompete agreement. Pursuant to the stock purchase agreement, petitioner agreed to sell his 260,000 shares of common stock of TNGS back to the corporation for a purchase price of $ 4,250,000. Eighty percent of this purchase price was allocated to the purchase price of the stock, and the remaining 20 percent was allocated to petitioner's agreement not to compete with the tourism activities of TNGS. The purchase price, including the price allocated to the noncompete agreement, was to be paid over a 5-year period; i.e., $ 1,275,000 in 1983, $ 425,000 in 1984, $ 850,000 in 1985, $ 850,000 in 1986, and $ 850,000 in 1987. This stock purchase agreement was amended in 1983 and again in 1985. Pursuant to the noncompete agreement, petitioner agreed for certain specified periods of time *425 not to sell to TNGS customers certain products and services sold by TNGS, not to engage in any business which would compete with any business activity of TNGS, and not to solicit or cause to be solicited any employees employed by TNGS to work for him or any organization with which he was affiliated. Petitioner subsequently breached this agreement by hiring certain prohibited employees, and pursuant to the noncompete agreement was required to pay TNGS $ 62,500 in damages. The noncompetition agreement stated that petitioner was required to include all noncompete payments in his Federal and State taxable income as ordinary income in the year that the payments were actually received by him. In 1985, the parties, via a written document, ratified and confirmed their original noncompete agreement. Pursuant to the noncompete agreement, TNGS agreed to pay petitioner $ 850,000 over a 5-year period, i.e., $ 255,000 in 1983, $ 85,000 in 1984, $ 170,000 in 1985, $ 170,000 in 1986, and $ 170,000 in 1987. In 1985, the parties amended the noncompete agreement to provide that petitioner would receive $ 120,000 in 1985 rather than $ 170,000. In this amendment, the parties reaffirmed petitioner's *426 rights under the original noncompete agreement. Petitioner was represented by legal counsel in the negotiations and execution of the stock purchase agreement and the noncompete agreement. The negotiation of these agreements extended over a 9- to 10-month period. Petitioner stated that the stock purchase agreement and the noncompete agreement were entered into in haste and that at all times he intended to go into a competing travel business. Petitioners' Tax Treatment of Stock Redemption and Noncompete Payments
An accountant by the name of Mr. Paul Richards prepared petitioners' original U.S. Federal individual income tax returns for taxable years 1980 through 1986. Richards also prepared petitioners' 1986 amended U.S. individual income tax return. The record does not reflect whether Richards had any knowledge of petitioner's noncompete agreement. In taxable years 1983, 1984, 1985, and 1986, petitioners received the respective amounts of $ 1,111,539, $ 425,000, $ 680,000, and $ 1,580,000 from TNGS. Petitioner indicated on his corresponding tax returns that the entire amounts received were for the purchase of stock. Petitioner elected to use the installment method of *427 reporting these payments. In taxable years 1983 through 1986, petitioners reported the respective amounts of $ 1,080,305, $ 413,058, $ 660,892, and $ 1,535,602, as long-term capital gain derived from petitioner's sale of TNGS stock. For taxable years 1983, 1984, and 1985, petitioners did not report any portion of the amounts received from TNGS as ordinary income received pursuant to petitioner's noncompete agreement. In 1986, petitioners reported $ 25,000 as ordinary income received pursuant to petitioner's covenant not to compete. Notice of Deficiency
Respondent issued a notice of deficiency to petitioners in which several determinations were made, many of which have been settled by the parties. Remaining for decision are respondent's determinations that (1) petitioners failed to report as taxable income the 1984 deposits totaling $ 1,062,500 as petitioner's distributive share of income derived from the Belkin Trust; (2) petitioners failed to report as ordinary income $ 255,000, $ 85,000, and $ 220,000 in taxable years 1983, 1984, and 1986, respectively, that petitioner received from his covenant not to compete with TNGS; (3) petitioners are liable for the negligence *428 additions to tax in each of the taxable years at issue pursuant to section 6653(a)(1)/6653(a)(1)(A) and 6653(a)(2)/6653(a)(1)(B); and (4) petitioners are liable for the addition to tax pursuant to section 6661(a) for substantial understatement of income tax for taxable years 1983 and 1984. OPINION Issue 1. Tax Treatment of 1984 Lewis Trust Deposits
The first issue involves respondent's determination that the 1984 deposits totaling $ 1,062,500 are includable in petitioners' 1984 taxable income as petitioner's distributive share of income derived by the Belkin Trust. On brief, respondent asserts that the deposits represent dividend income received by the Lewis Trust from ILT via the Belkin Trust. Respondent contends that these deposits are includable in petitioners' individual taxable income because the Lewis Trust is a grantor trust within sections 671 to 679, and petitioner is its deemed owner for tax purposes. As discussed in this Memorandum Opinion, petitioners have addressed why the 1984 deposits are not includable in their 1984 taxable income as dividend income received by ILT. Petitioners have not, however, addressed the issues of whether the Lewis Trust is a grantor *429 trust or whether petitioner is its deemed owner for tax purposes. The record indicates that petitioners do not dispute respondent's theory that income derived by the Lewis Trust is individually attributable to petitioner on this basis. [3] Further, it is immaterial whether respondent has proceeded on a wrong theory in determining that petitioner failed to report his distributive share of income derived by the Lewis Trust. See Bernstein v. Commissioner, 267 F.2d 879, 881 (5th Cir. 1959), affg. T.C. Memo. 1956-260. What is material is that petitioners prove that respondent's determination is wrong on any proper theory. Id.
*430 Petitioners assert several legal theories in support of their contention that respondent's determination is erroneous. Petitioners have asserted creative legal arguments in support of their legal theories; however, they have basically failed to introduce evidence supporting these legal arguments. We address each of petitioners' arguments seriatim. a. Constructive Dividends Constructively Received in Prior Years from ILT Petitioners first contend that the 1984 deposits are not includable in petitioners' 1984 taxable income because petitioners constructively received this income in prior years, the time for assessment and collection of which has expired pursuant to section 6501. Sec. 451(a); secs. 1.451-1 and -2, Income Tax Regs. The Court of Appeals for the First Circuit, to which an appeal of the instant case lies, has held that if a taxpayer actually receives income that was constructively received in a prior year and the statute of limitations precludes its assessment and collection in respect of the prior year, the income is still not includable in the taxpayer's income in the year it is actually received. Ross v. Commissioner, 169 F.2d 483, 492 (1st Cir. 1948). *431 In the instant case, all the net proceeds derived from the 1974-80 sale of optional tours were deposited into ILT's Cayman Islands bank account. Petitioners specifically contend that these proceeds were constructively received by petitioner and Belkin upon receipt of such by ILT. Petitioners did not include these proceeds in their 1974-80 taxable income, and the time for respondent to assess and collect tax on this income for those years had expired by the time the notice of deficiency was issued. Petitioners assert that the 1984 deposits are not includable in their 1984 taxable income because they represent petitioner's share of the actual distribution of this constructively received income. Sec. 451; Ross v. Commissioner, supra at 492; secs. 1.451-1 and -2, Income Tax Regs. Petitioners devote a substantial amount of their discussions on brief to addressing how the income derived from the 1974-80 sale of optional tours was income earned by TNT rather than ILT and how petitioner and Belkin constructively received such income in 1974-80. Petitioners have failed to prove, however, that the 1984 deposits represent the actual distribution of the income derived *432 from the 1974-80 sale of optional tours. All the income derived from the 1974-80 sale of optional tours was transferred to ILT. After the establishment of the Lewis Trust in 1977 and until 1980, upon ILT's receipt of these proceeds, ILT distributed one-half of them to the Belkin Trust and one-half to the Lewis Trust. Prior to the establishment of the Lewis Trust in 1977, the record does not indicate whether or not ILT distributed any of the proceeds it received from the sale of optional tours. After 1980, there were no deposits into ILT's Cayman Islands bank account from the sale of optional tours, and on December 31, 1980, ILT's bank account had a $ -0- balance. On the basis of these facts and petitioners' failure to prove otherwise, we find that ILT actually distributed all the income derived from the 1974-80 sale of optional tours prior to 1984. Accordingly, the 1984 deposits do not represent the actual distribution of income that petitioner "constructively received" from the 1974-80 sale of optional tours and, accordingly, these deposits are not excludable from petitioners' 1984 taxable income on this basis. b. Applicability of the Controlled Foreign Corporation Rules *433 Petitioners' next theory as to why the 1984 deposits are excludable from their 1984 taxable income is that they are excludable pursuant to section 959 of the controlled foreign corporation (CFC) rules because they represent actual distributions of income includable in prior taxable years pursuant to section 951. Section 951 provides that a U.S. shareholder of a CFC must include in gross income a pro rata share of certain earnings received and/or disposed of by the CFC even though such earnings are not currently distributed to the U.S. shareholder. The earnings includable in a U.S. shareholder's gross income pursuant to this section include "subpart F income" and "increases in earnings invested in U.S. property". Sec. 951(a)(1)(A)(i) and (a)(1)(B). When these earnings are actually distributed to the U.S. shareholder, the distribution is not again includable in the U.S. shareholder's gross income. Sec. 959(a). A "U.S. shareholder" is defined by section 951(b). A "CFC" is defined by section 957. Petitioners contend that ILT is a CFC, that petitioner is a U.S. shareholder of ILT, and that ILT received subpart F income or incurred increases in earnings invested in U.S. property *434 in years prior to 1984, a pro rata share of which was includable in petitioner's prior taxable years pursuant to section 951. Petitioners contend that the 1984 deposits represent the actual distribution of this previously includable income that is excludable in 1984 pursuant to section 959(a). Petitioner did not include his pro rata share of this alleged subpart F income or alleged increases in ILT's earnings invested in U.S. property in his taxable income in prior years. Respondent contends that the 1984 deposits are not excludable from petitioners' 1984 taxable income pursuant to section 959(a) because section 959(a) only excludes items when they were actually subject to Federal income tax pursuant to section 951. Because we conclude on other bases that section 959 does not exclude the 1984 deposits from petitioners' 1984 taxable income, we need not address respondent's contention. We first address the reason that the 1984 deposits are not excludable from petitioners' 1984 taxable income pursuant to section 959(a) as previously includable subpart F income. On convoluted bases which we need not detail, petitioners contend that the income derived from the 1974-80 sale of optional *435 tours represented subpart F income, that petitioner was required to include his pro rata share of this income in his taxable income in taxable years 1974 through 1980, and that the 1984 deposits are excludable from petitioners' 1984 taxable income because they represent the actual distribution of this previously includable subpart F income. Subpart F income is defined in section 952. Even assuming arguendo that the optional tour income derived in 1974 through 1980 constitutes subpart F income within the meaning of this section, as discussed supra, petitioners have failed to prove that ILT did not actually distribute this income to petitioner prior to 1984. Therefore, the 1984 deposits do not represent the actual distribution of this alleged subpart F income and, accordingly, the 1984 deposits are not excludable from petitioners' 1984 taxable income on this basis. We next address the reasons that the 1984 deposits are not excludable from petitioners' 1984 taxable income pursuant to section 959(a) as previously includable increases in earnings invested in U.S. property. The term "U.S. property" includes "an obligation of a U.S. person" held by a CFC. Sec. 956(b)(1)(C). Petitioners *436 contend that the Charlesgate and Taunton loans constituted "obligations of a U.S. person" held by ILT, that petitioner was required to include his pro rata share of these loan amounts in his taxable income in the years they were made, and that the 1984 deposits are excludable from petitioners' 1984 taxable income because they represent these previously includable items. Petitioners have first failed to prove that the Charlesgate and Taunton "loans" were valid debts for tax purposes. Petitioners in fact argue on brief that these "loans" were not valid for tax purposes. To establish the existence of a valid debt for tax purposes, the determinative question is whether there was a genuine intent to create a debt, with a reasonable expectation of repayment, and whether that intent comported with the economic reality of creating a debtor/creditor relationship. Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973). In the instant case, the parties to the Charlesgate and Taunton loans executed loan agreements, notes, mortgages, mortgage satisfaction documents, guarantees, and indemnification contracts. Thus, there were objective expressions of the *437 parties' intent to create debts pursuant to formal documentation of a debtor/creditor relationship. However, such objective evidence is insufficient to independently establish a valid debt for tax purposes. Id. The trier of fact must look beyond objective expressions of intent to create a debt and must ascertain the subjective expressions of intent to ascertain the parties' intentions in light of the substantive economic reality of the transaction. Id.
In the instant case, the record indicates that none of the parties to these loan transactions intended to enter into debtor/creditor relationships upon executing the above-referenced formal loan documents. None of the intermediate entities involved in the loan transactions, i.e., Gran Compania, Windikip, Mido, or Bristol Realty, would have entered the loan transactions had ILT not been the initial supplier of the loan proceeds, thus indicating that these entities had no intention of creating actual debtor/creditor relationships. Neither petitioner nor Belkin, the persons in control of Charlesgate and Taunton Associates, had any intention of repaying the Charlesgate and Taunton loans at the time the loan agreements were *438 entered into. Because petitioner and Belkin also controlled ILT, they also controlled whether ILT ever demanded payment on the loans. Further, the due date for each of the principal payments could have been extended indefinitely at petitioner's and Belkin's option, and some of the principal payments were reducible upon agreement by the involved "creditor". The culmination of these facts indicates that, in substance, none of the parties in entering the loan agreements pertaining to the Charlesgate and Taunton "loans" ever genuinely intended to create debts with a reasonable expectation of repaying those debts. The economic reality of the Charlesgate and Taunton "loans" indicates that ILT merely transferred money derived from the sale of optional tours to TNT, petitioner, and/or Belkin via transactions which, in form, would trigger no U.S. income tax consequences to any involved party. This economic reality is signified by the fact that a large portion of the Charlesgate loans, i.e., $ 600,000, was distributed equally to petitioner and Belkin and used for personal purposes. It is further signified by the fact that the parties arranged for the transfers to be made via entities *439 that could utilize advantageous tax treaty provisions regarding the withholding of income tax on interest payments. In sum, the Charlesgate and Taunton loans were not valid debts for tax purposes and accordingly are not "obligations" of a U.S. person held by ILT for purposes of qualifying as "increases in ILT's earnings invested in U.S. property" within the meaning of section 956(b)(1)(C). Even assuming that these loans were valid debts for tax purposes, petitioners have nevertheless failed to otherwise prove that petitioner's pro rata shares of these loan amounts were includable in their 1978 and 1980 taxable income pursuant to section 951(a)(1)(B) as increases in ILT's investment in U.S. property. For example, section 956(b) provides the definition of "U.S. property" and lists specific exceptions to this definition. Sec. 956(b)(1) and (2). The record fails to sufficiently establish the inapplicability of each of these exceptions to the Charlesgate and Taunton loans. Further, the amount of "earnings invested in U.S. property" is defined as the aggregate amount of such property held by the foreign corporation at the close of its taxable year to the extent such amount would have *440 constituted a dividend if it had been distributed. Sec. 956(a)(1). To determine the amount that constitutes a dividend, the general rules of section 316 apply, with modifications specified within section 956. Sec. 1.956-1(b)(1), Income Tax Regs. The record fails to establish the extent, if any, to which ILT had earnings and profits in taxable years 1978 and 1980 sufficient for the loans to be considered dividends. Secs. 316(a), 956(a)(1); see also infra section c. Finally, earnings invested in U.S. property are not includable in a U.S. shareholder's gross income pursuant to section 951(a)(1)(B) to the extent the earnings are includable in the U.S. shareholder's gross income pursuant to section 951(a)(1)(A), e.g., as subpart F income. Secs. 951(a)(1)(B), 959(a)(2). The record does not establish that ILT's earnings attributable to the Charlesgate and Taunton loans were not already includable in petitioner's gross income in taxable years 1976, 1978, or 1980, pursuant to section 951(a)(1)(A). In sum, petitioners have failed to prove that petitioner's pro rata share of the income derived from the 1974-80 sale of optional tours was includable in petitioners' prior taxable years *441 pursuant to section 951(a)(1)(A)(i) as subpart F income. Petitioners have also failed to prove that petitioner's pro rata shares of the Charlesgate and Taunton loan transactions were includable in petitioners' prior taxable years pursuant to section 951(a)(1)(B) as increases in ILT's investment in U.S. property. Accordingly, the 1984 deposits are not excludable from petitioners' 1984 taxable income pursuant to section 959(a) on either of these bases. c. ILT's Incapability of Making Dividend Distributions A distribution by a corporation to a shareholder in respect of the shareholder's stock is not includable in the shareholder's gross income as a dividend to the extent the corporation has insufficient earnings and profits. Secs. 301(a), (c)(1)-(3), 316(a). Petitioners next contend that the 1984 deposits do not represent a dividend distribution, and thus are not includable in their 1984 taxable income, because ILT had insufficient earnings and profits to make a dividend distribution in 1984. This contention is premised on the basis that ILT was a sham entity or a mere nominee of TNT and/or on the basis that ILT had insufficient earnings and profits to make a "dividend" distribution. *442 Regarding whether ILT was a sham or mere nominee of TNT, petitioners have the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). The general rule is that a corporate entity will be regarded for tax purposes if the corporation fulfills a useful business purpose and this purpose is the equivalent of a business activity or is followed by the corporation's carrying on of a business activity. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). In the instant case, ILT's purpose was to serve as a vehicle for petitioner's and Belkin's international business opportunities. Between 1974 and 1980, ILT served as a depository of the income derived from the sale of optional tours. ILT had an office address, maintained a bank account, had a Cayman Islands telephone number, and had at least two directors and three officers. The only evidence relied on by petitioners to support their contention that ILT was a sham or mere nominee of TNT is the testimony of O'Connor who possessed no personal, direct knowledge of whether ILT had officers, directors, business activities, or employees. Petitioners had the ability *443 to introduce evidence to support their contention that ILT was a sham. A party's failure to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. Llorente v. Commissioner, 74 T.C. 260, 268 (1980), affd. in part and revd. in part 649 F.2d 152 (2d Cir. 1981); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Accordingly, petitioners' failure to introduce evidence illustrating ILT's lack of economic substance gives rise to the presumption that had petitioners introduced evidence on this issue, such would indicate that ILT was not a sham entity. Petitioners have failed to prove that ILT was a sham entity and that its separate existence should be disregarded for tax purposes. Petitioners also contend that ILT had insufficient earnings and profits for a distribution from ILT to be deemed a dividend distribution. Petitioners base this contention on the premise that TNT rather than ILT was the recipient of the income derived from the sale of optional *444 tours in 1974 through 1980 and accordingly none of these earnings are includable in ILT's earnings and profits. Even if petitioners are correct in asserting that this income was TNT's, an issue on which we make no determination, petitioners have still failed to establish that ILT had no other source of earnings prior to taxable year 1984 that were includable in ILT's earnings and profits. While petitioner did testify that ILT had no other source of earnings than from the sale of optional tours, the record indicates otherwise. That is, between 1981 and 1984, unidentified amounts were deposited into and/or credited to ILT's Cayman Islands bank account in the approximate amount of $ 4.5 million. Petitioners introduced no evidence and did not address on brief why these deposits and/or credits are not includable in ILT's earnings and profits. In 1984, $ 1,450,000 and $ 708,658 was deposited into ILT's Cayman Islands bank account. Petitioners contend throughout their brief that these deposits merely represent proceeds received from refinancing the Charlesgate building and Taunton warehouse as part of petitioner's and Belkin's business separation in 1983 whereupon they agreed to equally *445 distribute all jointly owned real estate. Petitioners contend that the transfer of these proceeds between accounts that petitioner and Belkin controlled triggered no U.S. tax consequences. Petitioners have failed to show, however, how a transfer between separate taxable entities, i.e., a transfer from petitioner and Belkin to ILT, would not be includable in ILT's taxable income or in ILT's earnings and profits. In sum, petitioners have failed to prove that ILT had insufficient current or accumulated earnings and profits in 1984 for the 1984 deposits into the Lewis Trust not to be deemed dividend distributions from ILT via the Belkin Trust. In conclusion, having concluded that the 1984 deposits are not excludable from petitioners' 1984 taxable income on any bases asserted by petitioners, we sustain respondent's determination that petitioners failed to report $ 1,062,500 as petitioner's distributive share of income received from the Belkin Trust in taxable year 1984. Issue 2. Income Derived From Covenant Not to Compete
The next issue involves respondent's determination that in taxable years 1983, 1984, and 1986, petitioners received unreported ordinary income from petitioner's *446 covenant not to compete with TNGS in the respective amounts of $ 255,000, $ 85,000, and $ 220,000. Payments received by a covenantor pursuant to an noncompete agreement represent foregone compensation income and are includable as ordinary income upon receipt. Lazisky v. Commissioner, 72 T.C. 495, 500 (1979), affd. sub nom. Magnolia Surf, Inc. v. Commissioner, 636 F.2d 11 (1st Cir. 1980). Pursuant to the stock purchase and noncompete agreement entered into by petitioner, Belkin, and TNGS, 80 percent of the $ 4,250,000 petitioner was to receive was to be allocated to the purchase of petitioner's stock and 20 percent to petitioner's covenant not to compete. Petitioners assert that this allocation should be disregarded for tax purposes because it does not reflect the parties' true agreement. Courts have adopted different tests for determining whether an allocation contained within a noncompete agreement should be disregarded for tax purposes. The test adopted by the First Circuit, to which an appeal in this case would lie, is that the allocation contained within a noncompete agreement will be followed absent a showing of "strong proof" that *447 the parties intended a different allocation. Harvey Radio Laboratories, Inc. v. Commissioner, 470 F.2d 118, 119-120 (1st Cir. 1972), affg. T.C. Memo. 1972-85; Leslie S. Ray Insurance Agency, Inc. v. United States, 463 F.2d 210, 211-212 (1st Cir. 1972). We believe that the First Circuit would ask only whether the agreement as drawn truly represented the intention of the parties at the time it was signed. Lazisky v. Commissioner, supra at 502. To support their contention that the 80/20 allocation does not reflect Belkin's, TNGS', and petitioner's agreement, petitioners contend that the agreement was entered into in haste. The negotiations of the noncompete and stock purchase agreement, however, spanned a 9- to 10-month period. Further, petitioner was represented by legal counsel in the negotiation of and execution of these agreements. While petitioners assert on brief that the parties intended a different allocation, petitioner did not testify that the parties intended to allocate less than 20 percent of the purchase price to the noncompete agreement. Belkin, an available witness actually called *448 at trial by respondent, also did not testify that the parties intended to allocate less than 20 percent of the purchase price to this noncompete agreement. Further, several facts exist indicating that the original noncompete agreement contained the parties' true intent, e.g., TNGS enforced its rights pursuant to the agreement by seeking damages for petitioner's breach thereto, the parties reaffirmed petitioner's rights under the noncompete agreement 2 years after the agreement was entered into, and the parties ratified and confirmed their noncompete agreement 2 years after the agreement was originally entered into. In sum, petitioners have failed to introduce any evidence indicating that the parties intended to allocate less than 20 percent of the amount receivable pursuant to the stock purchase and noncompete agreement to petitioner's covenant not to compete. Petitioners do not dispute respondent's determination regarding the amount of noncompete payments received in taxable years 1983, 1984, and 1986. Accordingly, we sustain respondent's determination that petitioners failed to report as ordinary income $ 255,000, $ 85,000, and $ 220,000 that petitioner received from the noncompete *449 agreement in taxable years 1983, 1984, and 1986. [4] We note also that we have considered petitioners' other arguments on this issue and find them meritless. Issue 3. Additions to Tax
a. Negligence Additions to Tax Respondent determined that petitioners were liable for the additions to tax for negligence pursuant to section 6653(a)(1)/(a)(1)(A) in taxable years 1983 through 1986 in the respective amounts of $ 6,145, $ 30,716, $ 1,063, and $ 388 and pursuant to section 6653(a)(2)/(a)(1)(B) in the same years in an amount equal to 50 percent *450 of the interest due on the underpayment attributable to negligence. Negligence under section 6653(a) means lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have the burden of proving that they acted as reasonably prudent persons and exercised due care in not including the 1984 deposits in their 1984 taxable income and in not reporting the income derived from the covenant not to compete as ordinary income in 1983, 1985, and 1986. See Rule 142(a). Petitioners contend that they were not negligent in not reporting the 1984 deposits on their original and amended 1984 U.S. individual income tax returns because petitioner believed such were nontaxable loan repayment proceeds. For the following reasons, we do not find petitioner's purported belief tenable. The attorney that advised petitioners to file amended returns testified that he did not advise petitioners to include the 1984 deposits in their 1984 taxable income because petitioner told him that the deposits represented loan repayment proceeds. Petitioner testified, however, that *451 this attorney advised him not to report the 1984 deposits as taxable income in 1984 because they represented taxable income he received in the seventies. This inconsistency indicates the implausibility of petitioner's proffered explanation for why he did not report the 1984 deposits as taxable income on his original or amended 1984 U.S. individual income tax return. Accordingly, petitioners have failed to prove that they acted as reasonably prudent persons and exercised due care when they failed to include the 1984 deposits in their 1984 taxable income. Petitioners contend that they were not negligent in excluding as ordinary income the amounts received pursuant to the noncompete agreement because petitioner "treated such payments consistent with the state of the law and with the substance of the transaction". The substance of the transaction, however, was that the allocation of 20 percent of the purchase price to the noncompete agreement accorded with the parties' intentions. The state of the law was that this allocation was to be respected for tax purposes. The noncompete agreement even provides that petitioner was to report any payments received from this agreement as ordinary *452 income in the year funds were received by him, yet petitioner failed to do so. Accordingly, petitioners have failed to prove that they acted as reasonably prudent persons and exercised due care in excluding as ordinary income the amounts received pursuant to the noncompete agreement. We sustain respondent's determinations that petitioners are liable for the additions to tax for negligence as determined by respondent for each of the years in issue. b. Additions to Tax for Substantial Understatement Respondent determined that petitioners are liable for the addition to tax for substantial understatement of income tax pursuant to section 6661 in the amounts of $ 30,724 and $ 153,508 in taxable years 1983 and 1984. Petitioners contend that respondent should waive these additions to tax because petitioners had a reasonable cause for the understatements and because petitioners acted in good faith. Section 1.6661-6(a), Income Tax Regs., provides that respondent may waive all or part of the section 6661 additions to tax if the taxpayer shows that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Petitioners contend that respondent should have *453 waived the additions since they acted in good faith and had reasonable cause for the understatement relating to the 1984 deposits because petitioner believed no tax event occurred in 1984; i.e., petitioner believed these deposits were the receipt of nontaxable loan repayment proceeds. We do not find that respondent abused her discretion in declining to waive the additions. Petitioners did not show that they acted in good faith or had a reasonable cause for the understatement attributable to petitioners' failure to report the 1984 deposits. Petitioners contend that they acted in good faith and had a reasonable cause for the understatement relating to the income derived from the noncompete agreement because petitioner relied on an accountant's advice. Petitioners fail to identify the accountant on whom petitioners allegedly relied. The record does not indicate that the accountant who prepared petitioners' original 1983 through 1986 tax returns or 1986 amended tax return had any knowledge that a portion of the proceeds from petitioner's sale of stock was to be allocated to a noncompete agreement. Thus, this accountant could not have proffered any advice on which petitioners relied. *454 Further, the law firm that advised petitioner to file amended tax returns for 1980 through 1986 and that prepared petitioners' amended tax returns for 1980 through 1985 was commissioned by petitioner to advise him regarding the optional tours transactions; this firm was not consulted for advice regarding the noncompete agreement. Thus, we cannot find that this firm proffered any advice on which petitioners relied. In sum, petitioners have failed to show that respondent abused her discretion in failing to waive the additions. Accordingly, we sustain respondent's determination that petitioners are liable for the additions to tax for substantial understatement pursuant to section 6661(a). To reflect concessions and the foregoing, Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the underpayment attributable to negligence.↩
1. The Court uses the term "loan" throughout for reference purposes only and does not use the term to signify that the "loans" were valid debts for tax purposes.↩
2. The parties indicate that petitioners included $ 16,829.25 of the $ 354,329.25 deposit in their 1984 taxable income as interest income. Accordingly, this amount is not included in respondent's determination.↩
3. The evidence we found to make this conclusion is that (1) in 1986, the Widett law firm concluded that the Lewis Trust was a grantor trust and informed respondent by letter of this conclusion; (2) petitioners filed amended returns for taxable years 1980 through 1986 in order to report the income petitioner derived as the deemed owner of the Lewis Trust, a grantor trust; and (3) each of petitioners' arguments regarding the correct tax treatment of the 1984 deposits proceeds on the theory that distributions into the Lewis Trust represent income to petitioner.↩
4. The record indicates petitioner was to receive $ 170,000 in 1986 pursuant to the noncompete agreement. However, respondent determined that petitioners failed to report $ 220,000 as the amount of noncompete payments received in taxable year 1986. Petitioners presented no evidence disputing respondent's determination that petitioner actually received $ 220,000 in 1986 rather than $ 170,000. Accordingly, we sustain respondent's determination on this issue. See Rule 142(a).↩