# United States Tax Court

T.C. Memo. 2026-34

CATHRYN A. SIMMONS,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 14372-22.                                 Filed April 22, 2026.

————————

*Jason L. Moehlman*, for petitioner.

*Britton G. Wilson*, *Joline M. Wang*, and *Rae L. Ensor*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Chief Judge*: Petitioner, Cathryn A. Simmons, challenges deficiency determinations by the Internal Revenue Service (IRS) for her 2017 and 2019 tax years, as well as a section 6662(a)[1] accuracy-related penalty determined for the 2017 tax year. The parties have narrowed the issues in dispute to (1) certain deductions of Stuff, LC (Stuff), a limited liability company that Ms. Simmons owned and operated with her sister, (2) deductible expenses associated with two rental properties that Ms. Simmons owned, and (3) the accuracy-related penalty. We conclude that Ms. Simmons failed to fully substantiate the deductions in dispute and did not establish that she qualified for the reasonable cause exception to the accuracy-related penalty.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*2]                          FINDINGS OF FACT

We draw the following facts from the pleadings, stipulations of facts (together with their attached exhibits), and the evidence introduced at trial. Ms. Simmons lived in Missouri when she timely filed her petition.

I.    *Stuff*

During all years relevant to this case, Ms. Simmons and her sister owned Stuff, a Kansas City, Missouri, boutique that had sold handmade and small-batch specialty goods since 1996. Each sister held a 50% membership interest in Stuff, a Missouri limited liability company treated as a partnership for federal tax purposes.[2] Stuff used QuickBooks to track its business expenditures, dividing expenses into accounts such as (1) cost of goods sold, (2) interest, (3) advertising and promotion, (4) automobile, (5) travel, entertainment, meals, and lodging, and (6) charitable contributions.

The sisters sourced the merchandise for their store from both local artists and creators further afield. To find attractive products and to keep their finger on the cultural zeitgeist, the sisters ventured to New York, New York, and Atlanta, Georgia, twice a year to attend industry shows and vendor markets. While there, they would buy products, network with artists and colleagues, view art and retail items for purchase or inspiration, and study trends. The New York and Atlanta trip expenditures were logged as "travel, entertainment, meals, and lodging" in QuickBooks.

Stuff had a bank account but struggled to obtain loans or lines of credit throughout its history. The sisters accordingly turned to personal credit cards and loans to finance the business. Specifically, the sisters would retain favorable credit card offers, apply in their individual names as needed, and then use the cards to pay Stuff's business expenses. The sisters attempted to segregate the credit cards used for Stuff's expenses from their personal cards to avoid commingling personal and business expenditures.

During the years at issue the sisters maintained significant unpaid balances on at least seven different credit cards. As is the way

---

[2] Pursuant to sections 701 and 702, partnerships are flowthrough entities, with distributive shares of all items of income, gain, loss, deductions, and credit separately taken into account by their partners.

[*3] of the world, interest accrued on these balances, which Stuff recorded in the interest expense account in QuickBooks. Although six of the credit cards reflected Ms. Simmons's name with no reference to Stuff, Stuff routinely made payments on the outstanding balances.

In addition to applying for and using personal credit cards to facilitate Stuff's business, the sisters lent money personally to fund Stuff. Some of this money came from personal loans obtained by the sisters from their family. During 2017 the sisters each entered into two promissory notes with the Gary L. Simmons Living Trust (Father's Trust) and one promissory note with Vickie J. Duncan Simmons. Specifically, the sisters entered into promissory notes with Father's Trust on (1) February 1, 2017, for a loan of $7,500 payable on September 15, 2017, with 4% annual interest and (2) September 1, 2017, for a loan of $12,500 payable on January 31, 2018, with 4% annual interest. The promissory notes with Vickie J. Duncan Simmons reflected a loan on November 11, 2017, of $2,500 payable on January 31, 2018, with 4% annual interest.

In addition to interest and finance charges related to credit cards, the interest expense accounts for Stuff's 2017 QuickBooks reflected a total of seven checks to the sisters for interest. Specifically, the entries show (1) four checks totaling $247 (two to each sister) on January 31, 2017, (2) one check for $325 to Ms. Simmons's sister on August 15, 2017, and (3) two checks for $163 (one to each sister) on August 30, 2017. With respect to the last of these entries, each sister drafted a personal check dated September 1, 2017, to Gary Simmons for $163.

Stuff frequently supported local charities by hosting charity parties (especially around the holidays) and donating items or gift cards. For the charity parties, Stuff would donate an average of 15% of its sales during a designated event to a particular charitable organization. The sisters preferred to give gifts rather than discounts because of contractual obligations with the artists they represented, which prevented them from discounting an artist's work in their store. When products were donated, given as gifts, or given away as part of a promotion or loyalty program, a sale was entered into the point-of-sale system, and a memo was added to the receipt to reflect the donation or gift and the organization that received it. Stuff recorded some expenses for the charity parties in the charitable contributions account in QuickBooks and others in its advertising and promotion account because "it was hard to quantify . . . when [spending] was both promotion and charity."

**[\*4]** II.    *Rental Property*

Ms. Simmons owned a home built in 1950 that had been subdivided into a two-unit personal residence and two rental units. Both rental units were leased during the years at issue.

The terms of the lease agreements, including responsibility for utility expenses, were subject to negotiation between Ms. Simmons and her tenants. Ms. Simmons kept all accounts with utility companies in her own name to ensure that services would not lapse between tenants. Ms. Simmons's draft lease agreements for 2017 and 2019 provided that the "[t]enant shall be responsible for paying for gas and electricity utility services" and that "[t]hese amounts will be billed monthly to the [t]enant." On a spreadsheet relating to a 2017 tenant, Ms. Simmons recorded that the tenant paid a total of $7,500 in monthly rent payments and $579 in monthly "KCPL" payments.[3]

Ms. Simmons incurred expenses for maintenance and repairs with respect to her rental units. As relevant here, Ms. Simmons prepared handwritten lists of 2019 expenses categorized as "Advertising," "Repairs," or "Maintenance & Cleaning." These lists reflected the method of payment, e.g., "cash" or "Amex," the date, and the amount attributable to each rental unit (or "all"). The amounts reflected on the handwritten list for "Repairs" for 2019 totaled $5,969.

III.    *Tax Reporting and Court Proceedings*

A.    *2017 and 2019 Tax Returns*

Ms. Simmons timely filed individual income tax returns for the 2017 and 2019 tax years, reporting adjusted gross income of $19,242 for the former year and $7,109 for the latter. In reaching these amounts, Ms. Simmons reported partnership income from Stuff of $5,970 for 2017. She further reported rental income of $2,227 for 2017 and a loss of $9,825 for 2019.

As relevant to this case, the partnership income reported on Ms. Simmons's 2017 tax return derived from Stuff's partnership return for that year. On its return, Stuff reported, inter alia, gross receipts of

---

[3] We take judicial notice that Kansas City Power and Light Co. was an electric utility company headquartered in Kansas City, Missouri, from 1916 until 2018 when it merged with Westar Energy to form Evergy. *See* Fed. R. Evid. 201(b); Evergy History, Evergy, https://evergy.com/about-evergy/history (last visited April 2, 2026).

[*5] $682,576, cost of goods sold of $332,667, and total income of $352,114. Stuff reduced this income by total deductions of $340,174, including $47,732 for "advertising & promotion," $16,901 for "interest," $12,939 for "automobile expense," $11,377 for "non-reimbursed food," and $9,749 for "travel." Stuff reported $11,940 of ordinary business income, resulting in a distributive share of $5,970 for each sister.

With respect to her rental units, Ms. Simmons reported rental income of $17,900 for 2017 and $20,107 for 2019. She then deducted expenses, including utilities of $3,026 for 2017 and $3,738 for 2019, cleaning and maintenance of $1,607 for 2017 and $2,898 for 2019, and repairs of $3,320 for 2017 and $15,679 for 2019.

B.    *Notice of Deficiency*

The IRS issued a notice of deficiency, which determined (1) a deficiency of $80,536 and an accuracy-related penalty of $16,107 for 2017 and (2) a deficiency of $4,219 for 2019. As most relevant here, the notice disallowed for lack of substantiation many of the deductions reported on Stuff's 2017 return (that had reported the partnership income claimed on Ms. Simmons's return[4]). That notice specifically concluded that Ms. Simmons's distributive share of Stuff's 2017 income should have been $224,078 rather than $5,970 as reported. The notice further disallowed multiple deductions associated with Ms. Simmons's rental properties for both years, including deductions for depreciation, utilities, repairs, mortgage interest, and cleaning and maintenance.

---

[4] The parties have not addressed the applicability of the audit procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, or the Bipartisan Budget Act of 2015 (BBA), Pub. L. No. 114-74, § 1101(a), (g), 129 Stat. 584, 625, 638, or whether a partnership-level audit was required. The notice here implicated only Stuff's 2017 tax reporting. Absent evidence that an election was made pursuant to Treasury Regulation § 301.9100-22(b)(2), we assume that TEFRA procedures apply for years before 2018. *See* BBA § 1101(g)(4); *SN Worthington Holdings, LLC v. Commissioner*, 162 T.C. 228, 229 (2024) ("To elect into the BBA procedures for years before 2018, a partnership must submit to the Commissioner an election under Treasury Regulation § 301.9100-22(b)(2) that satisfies the requirements set forth in that regulation."). Under section 6231(a)(1)(B)(i), Stuff was exempt from the TEFRA unified audit procedures, and the record contains no indication that it elected partnership-level tax treatment. *See* I.R.C. § 6231(a)(1)(B)(ii). In this instance, the Commissioner's partner-level adjustments to partnership items appear to be valid. *See* Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates & Gifts* ¶ 114.4 (March 2026), Westlaw FTXIEG.

**[\*6]**  C.  *Procedural Background*

Ms. Simmons petitioned this Court for redetermination. In the lead-up to trial, the parties stipulated that Stuff had gross receipts of $710,837 for 2017[5] and that the IRS met the requirements of section 6751(b)(1) by timely obtaining written supervisory approval of the section 6662(a) penalty. The Commissioner also made multiple concessions both before and after trial.

As to Stuff's 2017 tax year, the Commissioner conceded (1) "all cost of goods sold items should be allowed as claimed on [Stuff's] return," (2) the travel expenses related to the New York and Atlanta trips reported on Stuff's return (subject to a reduction of meals expenses based upon the 50% limitation of section 274(n)),[6] (3) advertising and promotion expenses of $4,407, and (4) charitable contributions of $20,668. These concessions reduced Ms. Simmons's distributive share of Stuff's 2017 income from $224,078 as determined in the notice to $57,310. The parties dispute Stuff's entitlement to deductions for (1) automobile expenses, (2) "non-reimbursed food" expenses, (3) interest expenses, and (4) advertising and charitable contribution expenses in excess of those amounts allowed.

The Commissioner also made certain concessions relating to the rental properties. Specifically, he conceded that Ms. Simmons was entitled to the deductions claimed on her 2017 and 2019 returns for depreciation, mortgage interest, and cleaning and maintenance, as well as the deduction for repairs claimed on her 2017 return. These

---

[5] At trial Ms. Simmons suggested that she disagreed with the stipulation as to Stuff's 2017 gross receipts. She however did not seek to withdraw the stipulation or otherwise contest the issue in her posttrial brief, and this issue is therefore waived. *See Lake Jordan Holdings, LLC v. Commissioner*, T.C. Memo. 2025-123, at \*22–23 ("The parties largely stipulated . . . , with the Commissioner reserving only a narrow set of challenges to the [relevant issue]. The Commissioner did not raise such challenges in his posttrial brief, and we accordingly deem these issues abandoned or conceded.").

[6] Ms. Simmons has not contested the applicability of this limitation, and we deem any argument on this point waived. *See, e.g.*, *Thiessen v. Commissioner*, 146 T.C. 100, 106 (2016) ("[I]ssues and arguments not advanced on brief are considered to be abandoned."); *Alioto v. Commissioner*, T.C. Memo. 2025-125, at \*17; *Rockafellor v. Commissioner*, T.C. Memo. 2019-160, at \*12; *see also* Rule 151(e)(4) and (5).

**[\*7]** concessions left in dispute only Ms. Simmons's deductions claimed for utilities for both years and repairs for 2019.[7]

OPINION

I.    *Legal Standard*

    A.    *Burden of Proof*

The IRS's determinations in a notice of deficiency are generally presumed correct, and a taxpayer bears the burden to prove her entitlement to any deductions she claims. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). A taxpayer must satisfy the specific requirements for any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Although section 7491(a)(1) provides that the burden of proof shifts to the Commissioner in certain defined circumstances, Ms. Simmons does not contend, and the evidence does not establish, that the burden does so here. The burden thus remains with Ms. Simmons.

    B.    *Recordkeeping*

A taxpayer is required to keep sufficient records to substantiate her gross income, deductions, credits, and other tax attributes. *See* I.R.C. § 6001; Treas. Reg. § 1.6001-1(a); *see also* Treas. Reg. § 1.6001-1(e) ("The books or records . . . shall be retained so long as the contents thereof may become material in the administration of any internal revenue law."). Adequate substantiation must establish the nature, amount, and purpose of a claimed deduction. *See, e.g., Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

For some types of expenses, lack of substantiation can be overcome. *See, e.g., Phillips v. Commissioner*, T.C. Memo. 2013-215, at \*22–23. If a taxpayer establishes that a deductible expense has been paid but cannot establish the precise amount of the deductible expense, the Court may estimate the amount. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930).

---

[7] The Commissioner further conceded certain itemized deductions as claimed on Ms. Simmons's 2017 return.

**[\*8]**   In making the estimate, the Court bears heavily against the taxpayer who failed to more precisely substantiate the expense.  *See id.* at 544; *see also Rogers v. Commissioner*, T.C. Memo. 2014-141, at \*17.  The Court will not estimate a deductible expense unless the taxpayer presents a sufficient evidentiary basis on which an estimate can be made.  *See Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985); *Rodriguez v. Commissioner*, T.C. Memo. 2009-22, 2009 WL 211430, at \*4 (stating, with respect to the *Cohan* rule, that "we can't just guess").

A court may not invoke the *Cohan* doctrine to estimate the amount of a deductible expense subject to the strict substantiation requirements in section 274(d).  Such expenses include those relating to travel, meals and entertainment, gifts, and "listed property" under section 280F(d)(4).  I.R.C. § 274(d).  As relevant to the 2017 tax year, no deduction was allowed for such expenses "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement" (A) the amount of the expense, (B) the time and place of the entertainment or the use of the property, (C) the business purpose of the expense, and (D) the business relationship of the person using the property.  *Id.*; *see Nwafor v. Commissioner*, T.C. Memo. 2025-27, at \*8 (citing *Eze v. Commissioner*, T.C. Memo. 2022-83, at \*6, *aff'd*, No. 23-1062, 2023 WL 6972451 (4th Cir. Oct. 23, 2023)).[8]

II.    *Analysis*

   A.    *Stuff's Business Expense Deductions*

Section 162(a) permits a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  An expense is "ordinary" if it is "normal, usual, or customary" within a particular trade or business.  *Deputy v. du Pont*, 308 U.S. 488, 495 (1940).  It is necessary if it is appropriate and helpful for the business.  *Welch v. Helvering*, 290 U.S. at 113.  "A taxpayer's general statement that expenses were paid in pursuit of a trade or business is insufficient to establish that the expenses had a reasonably direct relationship to any such trade or business."  *Sham v. Commissioner*, T.C. Memo. 2020-119, at \*58; *see also Hopkins v. Commissioner*, T.C. Memo. 2005-49, 2005 WL 615687, at \*5.  The

---

[8] Congress amended section 274(d), effective for amounts incurred or paid after December 31, 2017.  This amendment does not affect any of the expenses at issue in this case as Stuff's expenses were incurred in 2017, and the 2019 property expenses did not implicate section 274(d).

**[\*9]** taxpayer bears the burden of substantiating expenses underlying her claimed deductions. *See* Rule 142(a); Treas. Reg. § 1.6001-1(a), (e).

### 1. *Expenses Subject to Strict Substantiation*

On its 2017 return Stuff claimed a deduction of $12,939 for automobile expenses. This deduction is subject to the strict substantiation requirements of section 274(d). *See* I.R.C. § 280F(d)(4)(A)(i) (defining "listed property" for purposes of section 274(d) as including any passenger automobile).

Ms. Simmons fails to satisfy the requirements of section 274(d). Ms. Simmons offers three pages of transactions recorded on Stuff's QuickBooks account (totaling $12,939), which reflect the date, amount, and payee of an expense, as well as its general purpose, such as, "gasoline," "rental reimbursement," "parking," "car lease," "monthly bus pass," "Uber," "car repair," and "mileage." She also provides two "closed end motor vehicle lease" agreements, with each sister listed as the lessee of a 2015 Lincoln MKC for a two-year term beginning in 2016. The record is devoid of any evidence substantiating Stuff's business purpose, however, and Stuff is not entitled to a deduction for these expenses. *See, e.g.*, *Ting Cai v. Commissioner*, T.C. Memo. 2018-52, at \*10.

### 2. *Expenses Not Subject to Strict Substantiation*

#### a. *"Non-Reimbursed Food" Expenses*

On its 2017 return Stuff claimed a deduction of $11,377 for "non-reimbursed food" expenses. Ms. Simmons did not adduce any evidence detailing the nature of these expenses, much less establish her entitlement to any deduction. We thus sustain its disallowance.[9]

#### b. *Interest Expenses*

Section 163(a) generally allows a deduction for all interest paid or accrued on indebtedness within the taxable year. A taxpayer may

---

[9] We note that Stuff's QuickBooks transactions entries feature a category for "Travel," which included subcategories for "Travel & Lodging Exp." and "Meals Exp." These entries reflect $9,749 in expenses associated with the 2017 Atlanta and New York events the sisters attended. Stuff's partnership return treated "Travel" separately from "Non-Reimbursed Food," which reflected $11,377 in expenses. As stated *supra* Findings of Fact Part III.C., the Commissioner conceded the deductibility of the Travel category subject to a reduction of meals expenses based upon the 50% limitation of section 274(n).

**[\*10]** deduct interest expenses only if they arose from the taxpayer's own indebtedness; a taxpayer cannot deduct interest expenses that arose from another's indebtedness. *Chapman v. Commissioner*, T.C. Memo. 2014-82, at \*9 (citing *Golder v. Commissioner*, 604 F.2d 34, 35 (9th Cir. 1979), *aff'g* T.C. Memo. 1976-150). "In the absence of an obligation of the taxpayer to pay interest, the taxpayer is barred from deducting interest notwithstanding the taxpayer's characterization of payments as interest payments." *Id.* (citing *Motel Co. v. Commissioner*, 340 F.2d 445, 447 (2d Cir. 1965), *aff'g* T.C. Memo. 1963-174).

On its 2017 partnership return, Stuff reported $16,901 of interest expenses. Stuff's QuickBooks account for 2017 reveals that this interest amount consists of (1) loan interest and (2) credit card interest and finance charges. Stuff is not entitled to deduct either category.

As an initial matter, Ms. Simmons fails to establish that the purported interest amounts Stuff paid to her and her sister arose from Stuff's own indebtedness. Ms. Simmons's sister testified that she and her sister "have been known to loan money into our business in cash and we do loan papers on that," and that the transaction entries reflected "the interest on the loan for which there would have been paperwork for." The record contains promissory notes between (1) the sisters and Father's Trust and (2) the sisters and Vickie J. Duncan Simmons, but no "loan papers" establishing Stuff's indebtedness to the sisters. Although Stuff paid the sisters on at least one occasion amounts that they then paid to their father as interest on their own loans, we cannot conclude from these payments and the sisters' testimony that Stuff had an actual legal obligation to pay interest to them. *See, e.g.*, *Hradesky*, 65 T.C. at 90 (rejecting "unverified oral testimony"); *see also Hopkins v. Commissioner*, 2005 WL 615687, at \*5 ("A taxpayer's general statement that his or her expenses were incurred in pursuit of a trade or business is not sufficient to establish that the expenses had a reasonably direct relationship to any such trade or business.").

Ms. Simmons likewise fails to demonstrate that Stuff was entitled to deduct the credit card interest and finance charges recorded on its QuickBooks account. The evidence shows that Ms. Simmons obtained and used credit cards in her own name to finance Stuff's business expenses given its inability to obtain credit on its own. Ms. Simmons fails to show that any credit card interest and finance charges constituted Stuff's own indebtedness rather than her personal indebtedness, and thus no deduction is appropriate. *See Chapman*, T.C. Memo. 2014-82, at \*9.

**[\*11]** Assuming arguendo that credit cards opened by Ms. Simmons constituted an indebtedness of Stuff, the record before us would not substantiate the amounts claimed. Although the sisters testified that they used the six designated credit cards exclusively for Stuff's expenses, they failed to establish the amounts and business purposes of the underlying expenditures that resulted in the interest and finance charges at issue. The testimony did not assuage concerns about possible (albeit inadvertent) commingling of business and personal expenditures. The sisters failed to identify any concrete examples of spending or offer a consistent explanation of how they made sure that the cards were used only for business purposes. Nor did they provide evidence that would allow us to estimate any deductions.

For his part, the Commissioner pointed out in his posttrial brief questionable transactions and inconsistencies between the QuickBooks transaction entries and credit card statements, to which Ms. Simmons offered no response. In short, we are left with the sisters' unsupported confidence that the credit card interest and finance charges stemmed only from business activity, which is insufficient to support the deductions. *See Hradesky*, 65 T.C. at 90 (rejecting "unverified oral testimony"); *Barrios v. Commissioner*, T.C. Memo. 2023-32, at \*4; *see also Shah v. Commissioner*, T.C. Memo. 2015-31, at \*43 (rejecting as sufficient substantiation the claim that a taxpayer "never entered an expense into Quicken without supporting bank information"); *cf. Cherizol v. Commissioner*, T.C. Memo. 2014-119, at \*11 ("In deciding whether a taxpayer has satisfied his or her burden of substantiating a deduction, we are not required to accept the taxpayer's . . . undocumented testimony.").

c.  *Advertising and Charitable Expenses*

On its 2017 partnership return Stuff claimed a $47,732 deduction for "Advertising & Promotion." According to Stuff's QuickBooks, this deduction encompassed (1) $17,278 in expenses recorded in Stuff's "Advertising and Promotions" account and (2) Stuff's $30,454 of expenses recorded in its "Charitable Contributions" account.

Mixing business expense deductions (such as advertising and promotion expenses) and charitable contribution deductions is problematic in the partnership context. Partnerships cannot deduct charitable contributions. I.R.C. § 703(a)(2)(C). Partners instead take into account their distributive shares of the partnership's charitable

**[\*12]** contributions on their own returns.   I.R.C. § 702(a)(4); *see also* Treas. Reg. § 1.703-1(a)(2)(iv).

This area is not without nuance.   "Payments that qualify as charitable contributions are not deductible as ordinary and necessary business expenses under section 162 if they fail to qualify as legitimate business expenses." *Pace v. Commissioner*, T.C. Memo. 2010-272, 2010 WL 5071598, at \*8.  We have deemed some payments to charities to meet this showing. *See Marquis v. Commissioner*, 49 T.C. 695, 702–03 (1968) ("[The taxpayer's] charitable clients represented a substantial, continuing, integral part of her business. . . . [I]t would stretch credulity to characterize the payments [to them] as 'contributions.'").   Other charitable payments we have not. *See, e.g.*, *May v. Commissioner*, T.C. Memo. 1996-135, 1996 WL 119496, at \*2 ("[Taxpayer] did not adequately explain why the payments [to religious organizations] were appropriate or helpful to his [piano] business, or how he expected them to produce commensurate benefits for his business . . . .").   In navigating these shoals, we have rejected the notion that "a payment must be considered a charitable contribution unless there is a binding obligation on the part of the recipient to furnish a quid pro quo." *Marquis*, 49 T.C. at 702.[10]

The Commissioner here concedes that Stuff spent $4,407 on advertising and promotion expenses and $20,668 on its charity parties. He asserts, however, that Ms. Simmons did not carry her burden to show that the party expenditures served a legitimate business purpose.  We disagree.  As Ms. Simmons's sister testified, Stuff used its associations with charities to promote the purchase of its merchandise.  For over a month near the end of the year, Stuff hosted parties for various charities, which typically received 15% of the sales from the day or evening of the party.  By tying charitable contributions to sales on a particular day, Stuff leveraged the milk of human kindness to encourage customers to visit its store and purchase its merchandise.  Stuff saw the expenses associated with its charitable parties as a means to drive sales, and we conclude that they were legitimate business expenses.

---

[10] Relying on Treasury Regulation § 1.162-15(a), the Commissioner argues that Stuff's charity party expenditures were not legitimate expenses because they were not made with a reasonable expectation of financial return commensurate with the amount of payment.  We note that the version of the regulation on which the Commissioner relies was not issued until 2020 and has no applicability to Stuff's 2017 tax year. *See* Treas. Reg. § 1.162-15(a)(4).

[*13] Ms. Simmons fails to persuade us that Stuff is entitled to deduct advertising and promotion expenses in excess of $25,075 ($4,407 + $20,668), however. Stuff's QuickBooks advertising and promotion transaction entries suffer from a dearth of information that would allow us to evaluate the nature of the alleged expenses or their business purposes. Nor did either sister testify in any detail as to the nature of the advertising and promotion expenses recorded on Stuff's QuickBooks or provide supporting documentation, such as receipts from Stuff's point-of-sale system. Moreover, Ms. Simmons fails to develop any argument on this point in her brief, further compelling the conclusion that she failed to substantiate advertising and promotion expenses in excess of those conceded by the Commissioner. *See, e.g.*, *Patel v. Commissioner*, Nos. 24344-17, et al., 165 T.C., slip op. at 35 (Nov. 12, 2025) ("The Court is not bound to sift through the record to develop arguments for a taxpayer, and we could reject [the taxpayer's] argument on this basis alone."); *Berkun v. Commissioner*, T.C. Memo. 2023-127, at *8 n.4.

Ms. Simmons likewise has failed to substantiate Stuff's charitable contributions (other than the charity party expenses). The record contains QuickBooks transaction entries that ostensibly show the amounts and dates of certain charitable contributions. These (non-charity-party) entries do not identify the donee organizations, much less establish compliance with substantiation rules governing charitable contributions. *See, e.g.*, Treas. Reg. § 1.170A-13(a)(1), (f) (requiring contemporaneous written acknowledgment for cash donation in excess of $250); *id.* para. (b)(1) (requiring maintenance of receipts for noncash contributions in excess of $250). Nor does the sisters' trial testimony fill in the gaps. We conclude that the evidence before us does not substantiate the claimed charitable contribution deductions. *See Barrios*, T.C. Memo. 2023-32, at *5–6 ("Moreover, the profit and loss statement merely contains a list of categories and amounts of expenses, without the introduction of any source documents underlying the figures. 'We treat [it] then as argument—not evidence . . . .'" (footnote omitted) (first quoting *Rodriguez v.* Commissioner, 2009 WL 211430, at *2; and then citing *Shah v. Commissioner*, T.C. Memo. 2015-31, at *43)).[11]

---

[11] As noted, even if Ms. Simmons had substantiated the amounts of Stuff's charitable contributions, Stuff would be unable to claim such deductions on its own returns.

**[\*14]** B.    *Rental Property Deductions*

During 2017 and 2019 Ms. Simmons rented two of the four units in her house, claiming (as relevant after concessions) deductions for repairs for 2019 and utilities for both 2017 and 2019. Deductions are allowed for all ordinary and necessary expenses paid or incurred to produce income related to properties held out for rent. I.R.C. § 212; *Henry v. Commissioner*, T.C. Memo. 2024-79, at \*40. Like other deductions, a taxpayer must maintain records sufficient to establish the amounts of each deduction shown on her return. I.R.C. § 6001; Treas. Reg. § 1.6001-1(a), (e).

1.    *Rental Property Repairs*

On her 2019 tax return Ms. Simmons deducted $15,679 in repair expenses related to her rental units. In support, she provided a handwritten spreadsheet entitled "Repairs," which reflected a total of $5,969 in expenses divided between Unit 1 ($1,666), Unit 2 ($3,653), and "All" ($650). Ms. Simmons also provided receipts and statements in support of this spreadsheet.

In his posttrial brief, the Commissioner conceded $5,644 in repair expenses, which was calculated by accepting the full amounts on the spreadsheet attributable to Units 1 and 2 and half of the "All" amount. Ms. Simmons did not challenge the scope of the Commissioner's concession.

Ms. Simmons has not substantiated repair expenses in excess of the Commissioner's concession. Although Ms. Simmons introduced numerous receipts, she failed to demonstrate that they established amounts spent on repairs in excess of the amounts reported on her spreadsheet, rather than amounts spent on maintenance and cleaning or advertising, which she treated separately. At trial she shed no further light, explaining: "I can't tell you specifically what [the expenses] are, but there's always large repairs." We therefore conclude that Ms. Simmons has substantiated a deduction of $5,644 for 2019 repair expenses.

2.    *Rental Property Utilities*

Ms. Simmons deducted $3,026 and $3,738 in utilities expenses for 2017 and 2019, respectively. She provided several utility bills, reflecting the monthly charges and showing that the bills were in her name.

**[\*15]** Although we believe that Ms. Simmons actually paid the bills, she is not entitled to any deduction. The draft lease agreements in the record uniformly provide that Ms. Simmons's tenants were responsible for reimbursing her for utility payments. The tenants thus were ultimately responsible for the payments. Indeed, the sole piece of evidence reflecting payments by a 2017 tenant confirms this understanding and shows utility payments to Ms. Simmons as well as rent payments. Although Ms. Simmons testified that she and her tenants often would negotiate lease terms, she failed to persuade us that any 2017 or 2019 leases deviated from the normal course. We therefore conclude that Ms. Simmons is not entitled to deduct utility expenses.

### C. *Accuracy-Related Penalty*

Section 6662(a) imposes an accuracy-related penalty of 20% on any portion of an underpayment of tax required to be shown on a return. This penalty applies, inter alia, to the portion of any underpayment attributable to negligence. I.R.C. § 6662(b)(1). Negligence includes the failure to properly substantiate items claimed on the return. Treas. Reg. § 1.6662-3(b)(1).

The Commissioner bears the burden of production with respect to a taxpayer's liability for the section 6662(a) penalty and must produce evidence that the imposition of the penalty is appropriate. *See* I.R.C. § 7491(c); *see also Higbee*, 116 T.C. at 446.[12] Should the Commissioner satisfy this burden, the burden shifts to the taxpayer to prove that she had reasonable cause and acted in good faith with respect to the underpayments. *See* I.R.C. § 6664(c); *Higbee*, 116 T.C. at 449.

The Commissioner has met his prima facie burden to show negligence. Ms. Simmons failed to substantiate her deductions claimed for the taxable years at issue, and the Commissioner thus has established negligence. *See* Treas. Reg. § 1.6662-3(b)(1); *see also Velez v. Commissioner*, T.C. Memo. 2018-46, at \*10 ("[The Commissioner] satisfied his burden of production with regard to negligence by establishing that [the taxpayer] did not maintain sufficient records to support the . . . deduction.").

Without further explanation, Ms. Simmons states only that "[she] has demonstrated that there was reasonable cause for any portion of the understatement and that she acted in good faith with respect to such

---

[12] The record establishes that the Commissioner met his burden of production under section 6751(b)(1), which Ms. Simmons does not contest.

**[*16]** portion such that she should be relieved of the [penalties]." A conclusory denial of this sort is insufficient to demonstrate reasonable cause. *See Ataya v. Commissioner*, T.C. Memo. 2025-55, at *9 (finding no reasonable cause or good faith where the taxpayers "failed to sufficiently prove this assertion with evidence in the record"). Accordingly, the Commissioner's determination of the section 6662(a) accuracy-related penalty is upheld.

To reflect the foregoing,

*Decision will be entered under Rule 155.*